(No. 80378.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GREGORY SHAW, Appellant.

*Opinion filed October 22, 1998.—Modified on denial of rehearing June 1, 1999.*

302

306

HARRISON and NICKELS, JJ., concurring in part and dissenting in part.

Joseph C. Polito, of Joliet, for appellant.

James E. Ryan, Attorney General, of Springfield, and James W. Glasgow, State's Attorney, of Joliet (Barbara A. Preiner, Solicitor General, and William L. Browers, Domenica A. Osterberger and Arleen C. Anderson, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

On October 5, 1994, defendant was charged in a six count indictment with armed robbery (720 ILCS 5/18—2(a) (West 1996)), felony murder (720 ILCS 5/9—1(a)(3) (West 1996)), first degree (knowing) murder (720 ILCS 5/9—1(a)(1) (West 1996)) and first degree (intentional) murder. 720 ILCS 5/9—1(a)(1) (West 1996). A jury found defendant guilty on all counts, pursuant to a theory of accountability. Defendant requested a jury for his capital sentencing hearing, and at the close of the first phase of the hearing, the jury unanimously found him eligible for capital punishment. 720 ILCS 5/9—1(b), (g) (West 1996). In the second phase of defendant's sentencing hearing, the jury determined that no mitigating factors existed that were sufficient to preclude imposition of capital punishment (720 ILCS 5/9—1(g) (West 1996)), and defendant was sentenced to death. Defendant's sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons which follow, we reverse defendant's convictions for armed robbery and felony murder, affirm his convictions for first degree (knowing) murder and first degree (intentional) murder; vacate defendant's

death sentence; and remand this matter for resentencing.

## BACKGROUND

### A. The State's Theories

Defendant's convictions arise from the conduct of defendant and Elton Williams on September 28, 1994, culminating in the shooting death of Officer Timothy Simenson of the Crest Hill police department. At trial, the State developed the theory that defendant aided and abetted Williams in the armed robbery of William Chaney, even though defendant did not himself commit the robbery. The State introduced evidence to show that immediately following the robbery of Chaney, defendant acted as Williams' accomplice when Williams shot and murdered Simenson.

In a separate trial, a jury found Williams guilty of first degree (knowing) murder, first degree (intentional) murder and felony murder. He was sentenced to death for these crimes. On direct appeal to this court, we affirmed Williams' convictions and sentence. *People v. Williams*, 181 Ill. 2d 297, 306 (1998). The present appeal addresses only defendant's convictions and sentence.

### B. The Evidence

Charles Pickens testified at trial that on the evening of September 27, 1994, Pickens and defendant drove together to defendant's mother's house in Pickens' automobile. En route to their destination, Pickens and defendant stopped at a liquor store. Pickens stated that defendant met Williams in the store. Defendant decided to leave the store with Williams and, as he left the liquor store at 6:30 or 7 p.m., Pickens saw defendant get into a small white car driven by Williams.

William Chaney testified that he arrived at his home, the Arbor Club apartment complex in Crest Hill, Illinois, shortly after midnight on September 28, 1994. As he

parked his car in the parking lot, Chaney noticed a white car parked two spaces away from his own automobile. The engine of the white car was running. Chaney could not see inside the car.

When Chaney walked toward the entrance to his apartment building, he noticed Williams running toward him. Armed with an altered .22-caliber rifle, Williams ordered Chaney to surrender his wallet. Chaney tossed his wallet, which contained two $100 bills and Chaney's pay stub folded between the bills, to Williams.

Chaney then went directly into his apartment and called 911. It was 12:23 a.m. Chaney informed the Crest Hill police dispatcher of the robbery, provided a physical description of Williams, and the fact that a white car might be involved.

At the 911 operator's direction, Chaney returned to the parking lot and found a Crest Hill police officer, Tom Evanoff, in a squad car waiting for him. Evanoff and Chaney drove half a block to the intersection of Theodore and Burry Circle, located at the border of Crest Hill and Joliet, Illinois. Chaney recognized the white car he had earlier seen in the Arbor Club parking lot, now stopped at the intersection. Two Crest Hill police cars were parked directly behind the white car. Chaney estimated that 10 to 12 feet separated the white car and the first police car behind the white car. The headlights of both police cars were illuminated.

Evanoff parked his squad car parallel to the first police car. From his unobstructed vantage point, Chaney observed two police officers standing at the white car with a third man, whom Chaney identified as the defendant. Chaney told Evanoff that he was not sure that defendant was the man who had robbed him. As Evanoff began to leave the squad car, Chaney saw one of the officers remove keys from the white car and walk to the car's trunk. Chaney noticed too that, when the officer

started to open the trunk, defendant bent over the hood of the police car parked immediately behind the white car. As the trunk deck rose, Chaney saw a gun barrel emerge from the trunk and fire two shots. The officer that opened the trunk fell backward, and a man standing in the trunk of the white car aimed a rifle at the second officer. Chaney heard "rapid and loud" gunfire, and he lay down in the back of Evanoff's squad car. After the shooting stopped, Chaney sat up and saw the second officer place handcuffs on defendant.

Chaney further testified that he did not see defendant during the robbery at the apartment complex, and that he never saw defendant in the white vehicle. Chaney never saw a weapon in defendant's hands.

Crest Hill police officers Ralph Smith and Evanoff also described the events of September 28, 1994. Smith testified that he was about 1¹/₂ miles from the intersection of Theodore and Burry when he heard the first dispatch about the robbery on his radio. The radio message, directed to Evanoff, stated that a robbery had occurred a few minutes earlier at Arbor Club complex. The robbery suspect was described as a black male in his mid-twenties, wearing a black jacket. The dispatcher also mentioned there was a white car in the area. Smith then heard a second radio communication, indicating that Evanoff would proceed to the apartment complex to interview the robbery victim, and that a third officer, Timothy Simenson, had seen and intended to stop a white Chevrolet Cavalier automobile at the intersection of Theodore and Burry.

Smith drove to Theodore and Burry, arriving there in approximately 1¹/₂ minutes. At the scene, Smith testified that he parked his car behind Simenson's car. Smith shone a spotlight located on his car toward a white Chevrolet Cavalier automobile parked in front of Simenson's car. Smith joined Simenson and the driver of the white

car, later identified as defendant, as they stood at the driver's side of the white car. Simenson directed defendant to go to the back of the white car. Defendant walked to the back of the car and without being ordered by either officer to do so, sat on the trunk deck. In the meantime, Simenson examined the interior of the white car, turned off the car engine, and returned to the back of the white car with the car keys in his hand. Simenson said he intended to open the trunk and told defendant to get off the trunk of the automobile. Defendant slid off the trunk but stayed near the back of the white car. Simenson again told defendant to move away and go with Smith to Simenson's car.

Smith walked behind defendant to Simenson's car, where defendant placed his hands on the front of the car and bent forward at the waist. Neither Smith nor Simenson had told defendant to do this, and Smith said he found defendant's actions "unusual." Because Evanoff had recently arrived at the scene and parked near Simenson's car, Smith told defendant to stand up and face Evanoff's car. Smith knew, from radio communications, that Evanoff was bringing Chaney with him to the scene to determine if Chaney could identify defendant.

As Smith and defendant stood with their backs to the white car, Smith heard the trunk of the white car open, followed by a gunshot. Smith testified that as he turned around, he heard a second shot, and saw Simenson falling backward "like a tree." Smith tried to aim his own weapon, but had to step to the right to avoid putting Simenson in his line of fire. As he moved, Smith saw a "male black, 20's," get out of the trunk and level a gun at him. Smith fired his weapon several times until the assailant fell to the ground. Smith and Evanoff placed handcuffs on defendant and Williams and summoned ambulances.

Smith testified that after the shooting ceased, he

turned to find defendant "spread-eagled" on the hood of Simenson's car. He did not know at what point defendant moved from a standing position to lying on the hood of the police car.

Defendant never told or indicated to Simenson or Smith that anyone was in the trunk of the white car.

Evanoff testified that at approximately midnight on September 28, Simenson and Evanoff were parked in their respective cars in a parking lot in Crest Hill. At 12:24 a.m., Evanoff received a dispatch regarding an armed robbery at the Arbor Club apartment complex. The radio dispatcher described a "male black, 25 years of age, wearing a black jacket." The communication also mentioned that a white vehicle "might be involved."

Simenson and Evanoff immediately drove in the direction of Arbor Club. The officers saw a white Chevrolet Cavalier automobile driving toward them, with an African-American male behind the wheel. Simenson made a U-turn and followed the white car. Evanoff continued on to Arbor Club.

After Evanoff arrived at the apartment complex, Simenson radioed Evanoff and asked for more descriptive information regarding the robbery suspect. Evanoff relayed Chaney's description to Simenson and then decided that he would bring Chaney to the intersection of Theodore and Burry. Evanoff estimated that he spent approximately five minutes at Arbor Club. He arrived at the intersection of Theodore and Burry at 12:31 a.m.

As he arrived at the scene, Evanoff could see Smith, defendant and Simenson standing at the rear of the white car. He watched defendant and Smith walk to the front of Simenson's car. Defendant put his hands on the front of Simenson's car and bent his body over the automobile. When defendant stood up, Chaney told Evanoff, "I think that's the guy but I am not positive." Evanoff saw Simenson walk to the rear of the white car, put the key in

the trunk lock and slowly raise the trunk deck, looking down into the trunk as he raised the lid.

According to Evanoff, an African-American male came out of the trunk, pointed a gun at Simenson's head and fired. Simenson's head was about one foot from the end of the gun barrel. Simenson's head jerked back and Evanoff heard a second shot. Evanoff said Simenson fell backward like a tree. Williams then jumped out of the trunk with both hands on his gun and "pointed down towards *** Smith."

Evanoff got out of his car, drew his own weapon and positioned himself behind the open door of his car. Evanoff started shooting and saw Williams' body jerk and fall.

An evidence technician employed by the Joliet police department, Gary Baggett, testified that in the early morning hours of September 28, 1994, he recovered Williams' clothes at St. Joseph Medical Center. From the pocket of Williams' pants, Baggett recovered two $100 bills, with a pay stub belonging to William Chaney folded between them.

Joseph Sapala, M.D., is a forensic pathologist. On September 28, 1994, he performed an autopsy on the body of Simenson. Sapala testified that Simenson received two gunshot wounds to the face: one in the right jaw and one in the lip. Based on stippling patterns formed by gunpowder at the jaw wound, Sapala determined that the gun was approximately 18 inches from Simenson's head when fired. One of the bullets entering Simenson's head traveled from the right front to the back of his head; the other traveled downward to the right side of the neck. Sapala opined that "even with the best medical treatment," the bullet that entered Simenson's lip would have proven fatal. He estimated the bullet that entered the jaw also had "a high degree of proving fatal." With the combination of the two wounds, Simenson had no chance

of surviving. Sapala further testified that "[Simenson] would have been dead before he hit the ground from those two wounds."

## ANALYSIS

In his appeal, defendant alleges several errors that occurred before and during his trial, and during the post-trial sentencing hearing. We address these issues in their chronological order.

## PRETRIAL

### Whether the Circuit Court Abused its Discretion by Excusing a Prospective Juror for Cause

Defendant asserts that the circuit court abused its discretion by granting the State's motion to dismiss prospective juror Jacqueline DePolo for cause. Defendant maintains that the trial court improperly refused to clarify DePolo's opinions regarding capital punishment. The State responds that the circuit court correctly exercised its discretion in gauging whether a venireperson would fulfill her obligation to abide by the court's instructions and her oath as a juror.

We repeat below the relevant colloquy that occurred between the circuit court and DePolo during *voir dire.* The question and response that defendant believes required clarification are set forth in italics.

"COURT: Mrs. DePolo *** I have a number of questions to ask of you. Some of them are a little bit lengthy. Because of that, ma'am, they might be a little bit confusing.

If you find yourself confused about a question, or unsure of it, please don't answer it. Ask me for some clarification or ask me to repeat it for you. *** Be sure that you don't answer a question that you are not positive about.

All right, now as I indicated in the court room, if the defendant is found guilty of the crimes charged in this matter, the State will be seeking the death penalty in a separate sentencing proceeding.

Do you have any scruples, by which I mean strong feel-

ings by reason of religion, morals or conscience against the infliction of the death penalty?

MRS. DEPOLO: No.

COURT: Are your beliefs such that regardless of the facts of the case or the background of the defendant, that under no circumstances could you consider signing a verdict directing the Court to sentence defendant to death?

MRS. DEPOLO: No.

COURT: Would your beliefs about the death penalty prevent or substantially impair your ability to reach a fair and impartial decision as to whether the defendant was guilty?

MRS. DEPOLO: No.

COURT: Do you have any strong feelings or beliefs in favor of the death penalty?

MRS. DEPOLO: No.

COURT: Are your beliefs such that regardless of the facts of the case or the background of the defendant, that if the defendant were found guilty as charged, you would automatically vote to impose the death penalty and would not consider signing a verdict which would result in a sentence of imprisonment?

MRS. DEPOLO: I'm sorry but could you repeat that?

COURT: No problem. Are your beliefs such that regardless of the facts of the case or the background of the defendant, that if the defendant were found guilty as charged here, you would automatically vote to impose the death penalty and would not consider signing a verdict which would result in a sentence of imprisonment?

MRS. DEPOLO: No.

COURT: *Are your beliefs such that regardless of the facts of the case or the background of the defendant, that if the defendant were found guilty as charged, you would automatically vote against the death penalty?*

MRS. DEPOLO: *Yes.*

COURT: Would your views on the death penalty prevent or substantially impair the performance of your duties as a juror in accordance with the Court's instructions as to the law and your oath as a juror?

MRS. DEPOLO: No." (Emphasis added.)

Following a conference between counsel and the

court, the court excused DePolo for cause and defense counsel objected:

"DEFENSE COUNSEL: Could the record reflect the objection by the Defense to the challenge for cause, please?

COURT: Yes, sir.

DEFENSE COUNSEL: And that's based on the fact that there was no attempt to rehabilitate the prospective juror with respect to the one question—the response to one question that was raised as the State's reason for challenging for cause.

COURT: All right. Yes, the record may reflect that, and the basis for the Court's ruling was it was apparent to the court she obviously understood the question. She did not pause in any way. She said that she would automatically sign a death—excuse me. That she would refuse to sign a death penalty verdict. I guess I should say she would automatically vote against the death penalty. That is the language of the question.

I was clear with her with regards to whether or not she understood questions, to ask for clarification or repetition. In fact, she did that on other questions. I don't see that there was any sort of equivocation whatsoever.

So the motion for challenge for cause was allowed."

A trial court may not exclude a prospective juror for cause because the juror voices general religious or conscientious reservations about capital punishment. *People v. Rissley*, 165 Ill. 2d 364, 401 (1995); *People v. Tenner*, 157 Ill. 2d 341, 362 (1993); *People v. Seuffer*, 144 Ill. 2d 482, 505 (1991). Removal for cause may occur only if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852 (1985), quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526 (1980); *Seuffer*, 144 Ill. 2d at 505. There is no "set catechism" the circuit court must recite, nor does this court demand that the potential juror answer questions with meticulous precision before the trial court may rule on a motion to

exclude for cause. *People v. Szabo*, 94 Ill. 2d 327, 354 (1983), citing *People v. Gaines*, 88 Ill. 2d 342, 356 (1981); *Tenner*, 157 Ill. 2d at 362-63. Rather, the responses of the venireperson must be viewed in their entirety. *Tenner*, 157 Ill. 2d at 363; *Szabo*, 94 Ill. 2d at 354. "The determination whether to allow a challenge for cause lies within the sound discretion of the circuit court [citation] and will not be disturbed absent an abuse of that discretion." *People v. Taylor*, 166 Ill. 2d 414, 421-22 (1995).

All of the factors we are obliged to apply to defendant's argument compel a finding that the court did not abuse its discretion in excusing DePolo. DePolo's answers were unequivocal. She did not voice generalized qualms concerning capital punishment that would have required further questioning (see *Szabo*, 94 Ill. 2d 327), but answered affirmatively the court's direct question of whether her beliefs would impair her ability to fulfill her obligations as a juror. Moreover, the record indicates that the court considered DePolo's response in its full context. The circuit court observed that DePolo appeared to understand the question and answered it without hesitation. Additionally, because DePolo had asked for clarification of a prior question, the fact she did not seek further clarification on the question at issue could lead the court to conclude that she understood all other questions put to her.

Admittedly, and as the State concedes, DePolo gave contradictory responses. In one instance, she indicated that circumstances existed where she would consider voting in favor of sentencing defendant to death. Later, she stated that, regardless of the evidence in this case, she would automatically vote against the death penalty.

Nevertheless, it is precisely in situations such as this, where the cold record suggests an apparent contradiction, that we defer to the circuit court's discretion. *People v. Holman*, 132 Ill. 2d 128, 148-49 (1989).

"It is axiomatic that a great deal of deference must be given to the circuit court, which is in a superior position to determine not only from a venireperson's responses as a whole but also from a venireperson's demeanor whether that person's views toward capital punishment would substantially prevent or impair the venireperson's performance of his or her duties as a juror in accord with the oath a juror is required to take." *Taylor*, 166 Ill. 2d at 424.

Here, the circuit court watched and heard DePolo as she answered the court's questions. The court specifically referenced DePolo's demeanor in justifying its decision to remove her for cause. This court cannot, on the record before it, substitute its speculations about DePolo's demeanor in place of the lower court's personal observations. Therefore, we find that the circuit court did not abuse its discretion.

## TRIAL

Defendant asserts that the circuit court made four erroneous rulings at trial. We proceed first to defendant's challenge to rulings relating to defendant's felony murder conviction and then to the alleged errors relevant to defendant's convictions for knowing and intentional murder.

### A. Felony Murder

1. *Whether the Circuit Court Erroneously Responded to a Question From the Jury During Deliberations*

At trial, the circuit court instructed the jury in part that:

"To sustain the charge of armed robbery, the State must prove the following propositions:

That the defendant, or one for whose conduct he is legally responsible, knowingly took property from the person or presence of William Chaney; and

That the defendant, or one for whose conduct he is legally responsible, did so by the use of force or by threatening imminent use of force; and

That the defendant, or one for whose conduct he is legally responsible, carried on or about his person a dangerous weapon or was otherwise armed with a dangerous weapon at the time of the taking."

The court further instructed the jury that:

"To sustain the charge of first degree murder, the State must prove the following propositions:

That the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of Timothy Simenson; and

That when the defendant or one for whose conduct he is legally responsible, did so, he intended to kill or do great bodily harm to Timothy Simenson; or he knew that his acts created a strong probability of death or great bodily harm to Timothy Simenson; or he was committing the offense of Armed Robbery."

The court also tendered an instruction explaining the theory of accountability:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense."

Following the commencement of jury deliberations, the court received the following note from the jury foreman: "Judge please answer. Please define the law as to when an armed robbery ends." Relying on *People v. Hickman*, 59 Ill. 2d 89 (1974), and over the objection of defense counsel, the court returned the following written response to the jury:

"The period of time an activity [sic] is involved in escaping to a place of safety are [sic] part of the commission of a crime. Please utilize this information and your collective memory of the evidence as well as your other instructions and continue deliberating."

Defendant insists that the circuit court's response to the jury's question amounted to reversible error. The judge's answer mischaracterized the elements of armed

robbery, defendant maintains. By informing the jury that the act of "escaping *** [is] part of the commission of the crime," the circuit court added an element to the armed robbery instruction and dictated a verdict against defendant on the armed robbery and felony murder charges.

Under certain circumstances, whether a trial court responds to a jury inquiry concerning instructions lies within the discretion of the court. *People v. Reid*, 136 Ill. 2d 27, 39 (1990). Where "[the jury] has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion," the court must answer the question. *People v. Childs*, 159 Ill. 2d 217, 229 (1994); *Reid*, 136 Ill. 2d at 39. "When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy." *Childs*, 159 Ill. 2d at 229.

At bar, the circuit court met its duty to respond to the question, but failed in its obligation to do so accurately. In *People v. Dennis*, 181 Ill. 2d 87, 105-06 (1998), this court recently explained that the "felony-murder escape" rule, stated in *Hickman*, and repeated by the circuit court in this case to the jury, cannot be applied to defendants charged with crimes pursuant to a theory of accountability.

In *Dennis*, the State charged the defendant with armed robbery pursuant to an accountability theory. During deliberations, the jury sent two notes to the trial judge. The first question asked, " 'When is the commission of the offense complete?' " *Dennis*, 181 Ill. 2d at 92. As the court and counsel discussed possible responses to the question, a second written question was sent from the jury room, " 'When is the commission of the crime over?' " *Dennis*, 181 Ill. 2d at 92. The trial judge in *Dennis*, like the judge in this case, relied on *Hickman* in formulating his response, " '[Y]ou may consider the pe-

riod of time and the activities involved in escaping to a place of safety.' " *Dennis*, 181 Ill. 2d at 92. The jury returned a guilty verdict.

This court reversed Dennis' armed robbery conviction, in part because the trial judge's answer to the jury's questions constituted reversible error. The *Dennis* court held that, by the plain terms of the Criminal Code of 1961 (720 ILCS 5/5—2(c) (West 1996)), accountability for another's crimes attaches only before or during the commission of the crime. *Dennis*, 181 Ill. 2d at 101. Once the elements of the crime are fulfilled, no guilt by accountability may occur. *Dennis*, 181 Ill. 2d at 101. Applying this rule to the facts before it, the *Dennis* court held that a defendant may be held accountable for the commission of an armed robbery if, "either *before or during the commission of the offense*, he aided or abetted [the perpetrator of the armed robbery] in 'conduct which is an element of [the] offense.' " (Emphasis added.) *Dennis*, 181 Ill. 2d at 101.

Continuing, the *Dennis* court reiterated the elements of armed robbery in Illinois: "the taking of property 'from the person or presence of another by the use of force or by threatening the imminent use of force' while 'armed with a dangerous weapon.' " *Dennis*, 181 Ill. 2d at 101, quoting 720 ILCS 5/18—1, 18—2(a) (West 1994). The offense of robbery is complete when force or threat of force causes the victim to part with possession or custody of property against his will. *Dennis*, 181 Ill. 2d at 102. The armed robbery extends into an escape from the crime only if force is used to effectuate the escape. *Dennis*, 181 Ill. 2d at 103. When force and taking, the essential elements animating the offense, have ended, so has the crime of armed robbery. *Dennis*, 181 Ill. 2d at 103.

*Dennis* acknowledged those authorities holding that, when a murder occurs during the course of an escape

from a robbery, the escape is within the operation of the felony-murder rule. *Dennis*, 181 Ill. 2d at 104. Nonetheless, in light of the different purposes underpinning the theories of felony murder and accountability, the *Dennis* court declined to extend the felony murder escape rule to prosecutions grounded in an accountability theory of liability. *Dennis*, 181 Ill. 2d at 105. Felony murder depends solely on a cause and effect relationship between the crime committed and the resulting murder to impose liability. *Dennis*, 181 Ill. 2d at 105. The object of the felony murder statute is to limit the violence that attends the commission of felonies, so that anyone engaging in that violence will be automatically subject to a murder prosecution, should a murder occur during the commission of a felony. *Dennis*, 181 Ill. 2d at 105. Whether the perpetrator *intended* to murder the victim during the course of a felony is irrelevant. *Dennis*, 181 Ill. 2d at 105.

In contrast, accountability depends entirely on the intent of the perpetrator for its viability. *Dennis*, 181 Ill. 2d at 105. Unless the accomplice *intends* to aid the commission of a crime, no guilt will attach. *Dennis*, 181 Ill. 2d at 105. In summation, this court held: "The felony-murder escape rule contemplates neither knowledge nor intent. Thus, the rule is irreconcilable with our accountability statute and we decline to apply it in that context." *Dennis*, 181 Ill. 2d at 105-06.

Under this analysis, the *Dennis* court ruled, the trial court's response to the jury's queries regarding the completion of armed robbery was "erroneous." *Dennis*, 181 Ill. 2d at 107. The felony-murder escape rule is "not applicable for accountability purposes," and escape is not an element of armed robbery for which the defendant could be held accountable. *Dennis*, 181 Ill. 2d at 107.

Moreover, this court found in *Dennis* that the circuit court's "instruction" injecting the felony-murder escape rule into the jury deliberations could not be dismissed as

merely harmless error. *Dennis*, 181 Ill. 2d at 107. Error arising from the tendering of jury instructions is deemed harmless only if the submission of proper instructions to the jury would not have yielded a different result. *Dennis*, 181 Ill. 2d at 107; see also *People v. Johnson*, 146 Ill. 2d 109, 137 (1991); *People v. Fierer*, 124 Ill. 2d 176, 187 (1988). The State cited evidence in *Dennis* which it believed demonstrated the defendant's accountability before and during the commission of the robbery. However, this court concluded that the jury's question to the judge asking when a robbery ends showed that the jury found such evidence unconvincing. *Dennis*, 181 Ill. 2d at 108.

Further, the court found "equally unavailing" evidence that the defendant was at the crime scene, that he failed to report the crime, and that his exculpatory testimony regarding the crime might have been incredible. *Dennis*, 181 Ill. 2d at 108. Presence at the commission of the crime, even when joined with flight from the crime or knowledge of its commission, is not sufficient to establish accountability. *Dennis*, 181 Ill. 2d at 108. The court observed as well that the defendant's testimony that he knew nothing of the robbery until after the crime ended was uncontradicted, so that both the State's and the defendant's versions of the crime could appear equally plausible to the jury. *Dennis*, 181 Ill. 2d at 109. Finally, and most importantly, the trial court's direction to " 'consider the period of time and activities involved in escaping to a place of safety' " clearly told the jury to consider escape as an element of the crime, so that, "[b]ut for the erroneous instruction, *** the result at trial might have been different." *Dennis*, 181 Ill. 2d at 109.

Even in the absence of exculpatory testimony from defendant in the instant appeal, we conclude that *Dennis* compels a reversal of defendant's conviction for armed

robbery. First, the State introduced no proof of any intent by defendant to further the robbery of Chaney. The State's case that defendant aided and abetted Williams before or during the armed robbery rested on circumstantial evidence that showed, at best, only defendant's presence at and flight from the Arbor Club apartment complex. While this court also acknowledges the short time frame in which the robbery and murder occurred, we conclude, again, that the sequence of events establishes no more than defendant's presence with Williams at the Arbor Club complex and at the intersection of Theodore and Burry. As stated in *Dennis*, presence at the crime scene, even when coupled with flight, cannot alone establish accountability.

Second, the circuit court in this case directed the jury to consider escape from the crime scene as an element of armed robbery in even more explicit terms than the lower court in *Dennis*. Whereas the trial court in *Dennis* told the jury to " 'consider *** activities involved in escaping to a place of safety' " (*Dennis*, 181 Ill. 2d at 92), the court in the case *sub judice* ordered the jury to consider escape as "part of the commission of the crime."

Like the jury in *Dennis*, the fact of the jury's question to the judge here demonstrated that the jury was unconvinced that defendant abetted Williams before the elements of armed robbery had been fulfilled by Williams. The possibility that the jury hinged its guilty verdict on defendant's participation in the escape from the crime is, in our view, equally as likely as a verdict based on defendant's assumed acts before Williams left Arbor Club. In sum, we cannot say that the verdict would have been the same even if the additional instruction had not been supplied by the court. See *Dennis*, 181 Ill. 2d at 109 ("On this record, we do not find evidence in support of defendant's armed robbery conviction so clear and convincing as to render the erroneous instruction harm-

less beyond a reasonable doubt"); *Childs*, 159 Ill. 2d at 234. Accordingly, we reverse defendant's conviction for armed robbery.

By definition, a felony murder is a murder that occurs during the commission of certain felonies, including armed robbery. 720 ILCS 5/9—1(a)(3) (West 1996). Accountability for felony murder, in turn, exists only if defendant may be deemed legally responsible for the felony that accompanies the murder. See *People v. Hicks*, 181 Ill. 2d 541, 547 (1998) (accountability in and of itself is not a crime, but is a mechanism through which a criminal conviction may be obtained; a charge based on accountability necessarily flows from the principal crime at issue); *People v. Stanciel*, 153 Ill. 2d 218, 234 (1992) ("Accountability, tied as it is to the crime charged, must comport with the requirements of that crime"). Because defendant is not accountable for the armed robbery of Chaney, he may not be held accountable for any murder occurring during the robbery. We therefore also reverse defendant's felony-murder conviction.

### 2. Whether the Circuit Court Erred in Denying Defendant's Motion for Directed Verdict on the Felony-Murder Count

Defendant insists that the circuit court erroneously denied his motion for directed verdict on the felony-murder count. Because we have found reversible error in the circuit court's instruction to the jury on this count, we need not address this argument.[1]

---

[1]In his reply brief and at oral argument, defendant articulated this question somewhat differently, seemingly suggesting that the State's failure to prove defendant's accountability for the felony murder required reversal of the guilty verdicts entered against defendant for knowing and intentional first degree murder. We find this argument puzzling, since the commission of the armed robbery and defendant's accountability for the same were relevant

## B. Intentional/Knowing Murder

### 1. *Whether the Circuit Court Improperly Submitted Illinois Pattern Jury Instruction 5.03A to the Jury*

Defendant criticizes the circuit court's approval of the State's instruction No. 11, regarding felony murder. Although we have reversed defendant's felony-murder conviction, defendant's argument calls into question defendant's convictions on all three murder counts, and therefore warrants our consideration.

Instruction No. 11 restates Illinois pattern jury instruction No. 5.03A (Illinois Pattern Jury Instructions, Criminal, No. 5.03A (3d ed. Supp. 1995)). Defendant maintains that the instruction should be limited to cases charging defendant with only felony murder. Defendant argues too that, having received the State's instruction No. 11, the jury should have been informed that instruction No. 11 applied solely to the felony-murder count and not to the remaining murder counts. Defendant theorizes that the lack of a clarifying instruction misled the jury into believing that defendant could be convicted on any of the murder counts merely on proof that "defendant and Williams agreed to [commit] armed robbery *** even if [defendant] did not intend to kill Officer Simenson."

The State correctly observes that defendant waived this argument by neglecting to object to the instruction at the jury instruction conference. *People v. Vargas*, 174 Ill. 2d 355, 362 (1996); *People v. Herrett*, 137 Ill. 2d 195, 209 (1990). By operation of Illinois Supreme Court Rule 615, however, we can review any question not otherwise properly preserved if we believe that plain error affecting a substantial right may have occurred. 134 Ill. 2d R. 615(a); *Vargas*, 174 Ill. 2d at 363; *Herrett*, 137 Ill. 2d at 209. In criminal cases, the plain error rule may be

---

only to the charges against him for armed robbery and felony murder. 720 ILCS 5/9—1(a) (West 1996).

invoked in two instances: first, where the evidence in the case is closely balanced (*Vargas*, 174 Ill. 2d at 363; *Herrett*, 137 Ill. 2d at 209), and second, where to leave the error uncorrected raises a substantial risk that the accused was denied a fair trial, and remedying the error is necessary to preserve the integrity of the judicial process (*Vargas*, 174 Ill. 2d at 363; *Herrett*, 137 Ill. 2d at 210). The error must be "so fundamental to the integrity of the judicial process that the trial court could not cure the error by sustaining an objection or instructing the jury to disregard the error." *Vargas*, 174 Ill. 2d at 364.

We find that the plain error doctrine cannot be applied here. As discussed subsequently in this opinion, the evidence supporting defendant's convictions for knowing and intentional murder is so convincing as to remove any suggestion that the evidence is closely balanced. As we also explain below, instruction No. 11 contains a correct statement of the law, and was adequately supplemented by other instructions that fairly and completely stated the law applicable to this criminal case. No affront to the judicial process occurred that would substantiate a finding of plain error. Thus, we do not find plain error necessitating review.

Nevertheless, waiver merely limits the parties' ability to raise an argument, not this court's right to entertain an argument. *People v. Hicks*, 181 Ill. 2d 541, 545 (1998). Consequently, we may, as we choose here, address the merits of this issue.

The State's instruction No. 11 reads:

"To sustain the charge of first degree murder, it is not necessary for the State to show that it was or may have been the original intent of the defendant or one for whose conduct he is legally responsible to kill the deceased, Timothy Simenson.

It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant and one for whose conduct he is legally responsible combined to do an

unlawful act, such as to commit armed robbery, and that the deceased was killed by one of the parties committing that unlawful act."

Initially, we note that defendant does not contend that instruction No. 11 *misstates* the law of felony murder. By tendering an instruction derived from the Illinois pattern jury instructions, the State followed this court's preference for pattern instructions, provided the instruction accurately states the principle of law for which it is submitted. *People v. Novak*, 163 Ill. 2d 93, 116 (1994); 134 Ill. 2d R. 451(a). Additionally, this court approved IPI 5.03A as a statement of felony murder in *People v. Ramey*, 151 Ill. 2d 498, 537 (1992).

Defendant's objection to instruction No. 11 chiefly arises from the committee note for IPI 5.03A, which advises that "[b]ecause the supreme court has approved this instruction to date only in the context of a felony murder case involving an alleged accomplice, the Committee believes this instruction should not be used in any other case." Illinois Pattern Jury Instructions, Criminal, No. 5.03A, Committee Note (3d ed. Supp. 1995).

In this appeal, we discern two reasons to decline the committee's suggestion. First, the phrase "any other case" in the comment is not entirely clear. The phrase might be construed to mean any case in which murder is charged pursuant to theories other than felony murder. However, it could just as easily refer to those cases in which accountability is inapplicable to the charge of felony murder.

In any event, we find that, in the case at bar, the committee's directive limiting use of the instruction to a particular fact pattern conflicts with a fundamental rule of law. As stated in *Ramey*, "[a]n individual instruction should not be judged in artificial isolation; rather, the instruction should be examined in light of the overall charge." *Ramey*, 151 Ill. 2d at 537. If all of the instructions, read together, completely and fairly state the law

governing disposition of the case, no error occurs in instructing the jury. This is true even when the instruction complained of is, alone, superfluous or misleading. *People v. Weaver*, 18 Ill. 2d 108, 116 (1959); *People v. Marsh*, 403 Ill. 81, 94 (1949).

In the appeal at bar, the jury received complete and thorough instructions concerning first degree (knowing) murder and first degree (intentional) murder, in addition to instructions concerning armed robbery and felony murder. These same instructions clearly stated that the knowing and intentional murder charges were separate and distinct from the felony-murder charge.

Similarly, the jury received separate verdict forms for each crime charged against defendant. In addition to armed robbery, the jury received separate verdict forms for: "the offense of first degree murder intending to kill Timothy Simenson"; "the offense of first degree murder knowing the acts created a strong probability of death or great bodily harm to Timothy Simenson"; "the offense of first degree murder while committing the offense of armed robbery."

Reading the instructions collectively, as we must (*People v. Housby*, 84 Ill. 2d 415, 433-34 (1981)), we find that no error occurred in the tendering of instruction No. 11. In their entirety, the instructions fully and fairly announced the law applicable to the theories of the State and defendant. *People v. Terry*, 99 Ill. 2d 508, 516 (1984); *Weaver*, 18 Ill. 2d at 116; *Marsh*, 403 Ill. at 94. Through the several instructions and verdict forms, the jury was informed, more than once, that defendant was charged under different theories of first degree murder. We also find the instructions facially clear and comprehensible. Defendant's concern that instruction No. 11 confused the jury is without merit.

## 2. *Whether Certain Statements Made by the State During Closing Arguments Unfairly Prejudiced Defendant's Case*

Defendant complains next of four statements made by the assistant State's Attorney during closing arguments. Each of the statements was intended to persuade the jury that Williams and defendant planned to shoot Simenson when he opened the trunk of the white car. Defendant correctly observes that his participation in the planning was essential to the State's accountability theory of liability against defendant. Defendant insists that the prosecutor's statements were not grounded in fact or in any reasonable inferences arising from the evidence admitted at the guilt/innocence phase of the trial.

In pertinent part, counsel for the State argued:

"He knew what was going to occur from his signal to Elton Williams. He knew Elton was going to come out shooting, and he wanted to get out of the way of the shots.

\* \* \*

Why did he do that? Because he knows the moment the trunk comes up pursuant to their preconceived plan, the fireworks is going to start \*\*\*.

\* \* \*

Gregory Shaw is behind the wheel ready to let him in the trunk, ready to take off, and prepared to have Elton Williams come out of that trunk and shoot any police officer who tries to apprehend them.

\* \* \*

That none of these actions could have been accomplished without the complete complicity of Gregory Shaw and that the murder was a preplanned situation with regards to Gregory Shaw and Elton Williams that, if the trunk opened, Mr. Williams would take care of business."

Defendant concedes that defense counsel failed to raise contemporaneous objections to any statement but the third. As to the first, second and fourth passages quoted above, defendant relies on the plain error doctrine to earn appellate review.

As previously explained, we apply the plain error doc-

trine only where the evidence of defendant's guilt is closely balanced, or where the alleged error is so substantial or so fundamental as to deprive defendant of a fair trial. *People v. Edgeston*, 157 Ill. 2d 201, 239-40 (1993); 134 Ill. 2d R. 615(a). Convincing evidence was admitted at trial of defendant's accountability for knowing and intentional murder. Chaney, Evanoff and Smith recounted defendant's actions during the car stop at the intersection of Theodore and Burry. When told to go to the back of the white car by Officer Simenson, defendant sat on the trunk of the automobile, although he was not directed to do so. When Simenson told him to get off the white car, defendant slowly slid off, but remained leaning against it. Moreover, when Simenson said he was going to open the trunk and ordered defendant to walk to Simenson's police car, which was parked immediately behind the white car, defendant bent forward at the waist in order to lie on the hood of Simenson's car. As before, defendant was not directed by Smith or Simenson to do this.

These acts, combined with defendant's utter failure to alert the police to the presence of an armed man in the trunk of the white car, give rise to legitimate inferences that defendant not only knew that Williams intended to shoot the person who opened the trunk of the automobile, but also that defendant and Williams preplanned a signal to be delivered by defendant to Williams that the trunk was about to be opened.

From the foregoing, we find that the evidence supporting a theory of accountability for intentional and knowing murder was not closely balanced. Nor can we conclude that admission of the statements worked a substantial or fundamental unfairness on defendant: the State's closing argument was consistent with facts admitted at trial. Therefore, the plain error doctrine does not apply to the first, second and fourth statements.

In the alternative, defendant contends that his lawyer's failure to object to the State's remarks amounted to ineffective assistance of counsel. To demonstrate ineffective assistance of counsel, defendant must show (1) that his attorney's performance fell below an objective standard of reasonableness and (2) that the attorney's deficient performance resulted in prejudice to defendant. *Williams*, 181 Ill. 2d at 320, citing *Strickland v. Washington*, 466 U.S. 668, 687, 697, 80 L. Ed. 2d 674, 693, 699, 104 S. Ct. 2052, 2064, 2069 (1984). Because defendant must satisfy both prongs of the test, the failure to satisfy either element precludes a finding of ineffective assistance of counsel under *Strickland*. *Williams*, 181 Ill. 2d at 320.

We can dispose of defendant's ineffective-assistance charge on the "prejudice" prong alone. Any objection to the prosecutor's remarks would rightfully have been denied, since each statement was justified by evidence admitted at trial. Had defense counsel objected, therefore, the result would have been no different than the effect of his failure to object. No prejudice resulted from the defense attorney's purportedly ineffective assistance.

As to the third statement,[2] we are reminded that, generally, courts accord wide latitude to the prosecutor during closing argument, provided counsel grounds his

---

[2]The transcript of the State's closing argument indicates that the defendant did not contemporaneously object to this statement, but rather to two sentences stated shortly thereafter.

"ASS'T. STATES' ATTORNEY: So they had to have a little conversation, a little agreement. Hey, Greg, you drive, I'll do the shooting.

DEFENSE COUNSEL: Your Honor, I am going to object. There is absolutely not one shred of evidence that [the assistant State's Attorney] is alluding to ***."

Even though defendant failed to timely object, we exercise our discretion to consider the merits of defendant's argument. See *People v. McNeal*, 175 Ill. 2d 335, 364 (1997).

argument in the evidence or in inferences fairly yielded by the evidence. *People v. Enis*, 163 Ill. 2d 367, 407 (1994); *Edgeston*, 157 Ill. 2d at 240; *People v. Owens*, 102 Ill. 2d 88, 105 (1984). The remarks by the State that defendant now calls into question were reasonably implied by the State's proof. No error occurred.

Equally unavailing is defendant's insistence that the only evidence supporting defendant's alleged accountability for Simenson's murder was introduced at the aggravation/mitigation phase of defendant's sentencing hearing, and not at the guilt/innocence phase of defendant's trial. Defendant refers to the testimony of Timothy Beavers, who testified in aggravation on behalf of the State. Beavers averred that, while incarcerated with defendant at the Will County jail in October 1994, defendant told Beavers that defendant and Williams robbed two persons on September 28, 1994, and that they took between $100 and $200 from one of those individuals. In his testimony, Beavers also recounted defendant's statements that defendant and Williams decided to hide Williams in the trunk of their getaway car because the police "would be looking for two people, not one." According to Beavers, defendant further told him that, in the event defendant and Williams were stopped in their flight by the police, Williams would "take care of business." Beavers interpreted this phrase as "do whatever you got to do."

Beavers' testimony may have been anticipated by the prosecutor when he used the phrase "take care of business" in his closing argument at the guilt phase. Nonetheless, the colloquialism is sufficiently commonplace that the attorney might not have used it as a reference to Beavers' statements. At the time the jury heard the prosecutor's argument, Beavers had not yet testified, so any impact the State intended by use of "take care of

business" would have been lost on the jury. Most importantly, the State furnished more than adequate proof during the guilt/innocence phase of the trial that defendant aided and abetted Williams in Simenson's murder. Our review of the record satisfies us that "take care of business" at best emphasized the elements of accountability that the State had already proved beyond a reasonable doubt.

## ELIGIBILITY PHASE

### Whether the Circuit Court Erred in Failing to Instruct the Jury That Defendant Was Not Eligible for the Death Penalty Unless the State Proved Defendant's Culpable Mental State

Defendant contends that this court should find defendant "not death eligible" because the jury was improperly instructed during the first, or "eligibility," phase of his sentencing hearing. Relying on *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982), and *Tison v. Arizona*, 481 U.S. 137, 95 L. Ed. 2d 127, 107 S. Ct. 1676 (1987), defendant insists that a finding of eligibility for the death penalty preliminarily requires a determination by the jury that defendant possessed a culpable mental state during the commission of the crimes charged. Defendant maintains that the jury received no instructions at the hearing that would have permitted it to make such a finding and, therefore, that the death sentence must be vacated.

The State responds that defendant neglected to properly preserve this question for our review. Because we choose to address the merits of defendant's argument, however, we need not decide whether this element of defendant's appeal has been waived.

In *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982), the United States Supreme Court compared the individual culpability of Enmund,

who had been sentenced to death for felony murder under a theory of accountability, to the culpability of his accomplices, the persons who actually killed the victim during the course of the felony murder. The *Enmund* court observed that pursuant to the cruel and unusual punishment clause of the eighth amendment, criminal punishments cannot be excessively lengthy or severe in proportion to the crime charged. *Enmund*, 458 U.S. at 788, 73 L. Ed. 2d at 1146, 102 S. Ct. at 3372. The Court said: "It is fundamental that 'causing harm intentionally must be punished more severely than causing the same harm unintentionally.' " *Enmund*, 458 U.S. at 798, 73 L. Ed. 2d at 1152, 102 S. Ct. at 3377, citing H. Hart, Punishment and Responsibility 162 (1968). Facts introduced at Enmund's trial proved that Enmund neither "kill[ed] nor] attempt[ed] to kill *** [and did not] warrant a finding that Enmund had any intention of participating in or facilitating a murder." *Enmund*, 458 U.S. at 798, 801, 73 L. Ed. 2d at 1152, 1154, 102 S. Ct. at 3377, 3378-79. To treat the actual killers and Enmund alike for purposes of imposing a capital sentence ignored that their individual degrees of personal culpability were "plainly different" and violated the eighth amendment. *Enmund*, 458 U.S. at 798, 73 L. Ed. 2d at 1152, 102 S. Ct. at 3377.

The United States Supreme Court revisited the question of proportionality in capital sentencing in *Tison v. Arizona*, 481 U.S. 137, 95 L. Ed. 2d 127, 107 S. Ct. 1676 (1987). There, defendants Ricky and Raymond Tison received the death penalty pursuant to Arizona statutes that (1) defined capital murder as a killing occurring during the perpetration of a robbery or kidnapping, and (2) held each participant in a robbery or kidnapping legally responsible for the acts of his accomplices. *Tison*, 481 U.S. at 141, 95 L. Ed. 2d at 134, 107 S. Ct. at 1679-80. Like Enmund, neither Tison committed the murders in question, yet unlike Enmund, the Tisons' "degree of

participation in the [underlying] crimes was major rather than minor, and the record *** support[ed] a finding of the culpable mental state of reckless indifference to human life." *Tison*, 481 U.S. at 151, 95 L. Ed. 2d at 140, 107 S. Ct. at 1684. To the *Tison* Court, this "major participation in the felony committed, combined with reckless indifference to human life" (*Tison*, 481 U.S. at 158, 95 L. Ed. 2d at 145, 107 S. Ct. at 1688), moved the Tisons' acts far beyond Enmund's conduct on the spectrum of personal culpability. Imposition of the death penalty in *Tison* did not violate the eighth amendment's prescriptions for proportionality, since the Tisons' purposeful criminal conduct justified a more serious punishment.

Whether the circuit court erred by failing to instruct the jury on defendant's personal culpability for the felony murder is, in the instant appeal, moot, since we have reversed defendant's conviction for that crime. As to defendant's convictions for intentional and knowing murder, we hold that the jury made the necessary finding of defendant's individual culpability.

The *Enmund/Tison* rule does not require that a finding of culpability be made at a particular stage of the sentencing hearing. *Cabana v. Bullock*, 474 U.S. 376, 386, 88 L. Ed. 2d 704, 716-17, 106 S. Ct. 689, 697 (1986). "The Eighth Amendment is satisfied so long as the death penalty is not imposed upon a person ineligible under *Enmund* for such punishment." *Cabana*, 474 U.S. at 386, 88 L. Ed. 2d at 716, 106 S. Ct. at 697. "At what precise point in its criminal process a State chooses to make the *Enmund* determination is of little concern from the standpoint of the Constitution." *Cabana*, 474 U.S. at 386, 88 L. Ed. 2d at 717, 106 S. Ct. at 697. Applying this standard to appeals in Illinois, we have ruled that the necessary findings of culpability can be made by the trial court at a sentencing hearing. *People v. Thompkins*, 121 Ill. 2d 401, 456 (1988).

Turning to the present appeal, we hold that the jury made the requisite finding of defendant's personal culpability for Simenson's murder. By virtue of defendant's convictions for knowing and intentional murder, the jury necessarily found that defendant, with an intent to promote or facilitate the murder, knowingly aided or abetted Williams' intentional murder of Simenson, or aided or abetted acts creating a strong probability of death or great bodily harm to Simenson. These findings, compelled by instructions tendered to the jury, are, in our opinion, illustrative of a "reckless indifference to human life" (*Tison*, 481 U.S. at 151, 95 L. Ed. 2d at 140, 107 S. Ct. at 1684) by defendant, and even of an intent that a " 'killing take place or that lethal force \*\*\* be employed.' " *People v. Jimerson*, 127 Ill. 2d 12, 48, quoting *Enmund*, 458 U.S. at 797, 73 L. Ed. 2d at 1151, 102 S. Ct. at 3376. The guilty verdicts for knowing and intentional murder established defendant's culpable mental state for Simenson's death, even though Williams may have been the person that actually fired the shots that killed Simenson. See *People v. Coleman*, 168 Ill. 2d 509, 529-30 (1995) (jury's guilt phase finding of the requisite mental state satisfies *Enmund* requirements). Therefore, the absence of instructions directing the jury to render a finding on defendant's personal culpability was not error.

Lastly, defendant cannot complain that his lawyer's failure to tender *Enmund/Tison* instructions denied defendant effective legal assistance. No prejudice could have flowed from that omission where defendant's mental state had already been determined by the jury.

## AGGRAVATION/MITIGATION PHASE

Whether Introduction of Defendant's Armed Robbery Conviction Requires This Court to Vacate Defendant's Death Sentence

At the close of the first phase of defendant's sentenc-

ing hearing, the jury found defendant death-eligible based on a single statutory aggravating factor, namely, that Officer Simenson was a peace officer killed in the line of duty (720 ILCS 5/9—1(b)(1) (West 1996)). The sentencing hearing proceeded to its second, or "aggravation/mitigation," phase, where the jury weighed factors favoring imposition of the death penalty against factors favoring mercy toward defendant. 720 ILCS 5/9—1(g) (West 1996). One of the nonstatutory aggravating factors argued by the State in the second phase was defendant's conviction for armed robbery.

Defendant argues that, in light of our reversal of defendant's armed robbery conviction, the State introduced an improper aggravating factor before the jury which requires this court to vacate defendant's sentence. Defendant cites nine instances where counsel for the State argued the fact of defendant's armed robbery conviction to the jury during the aggravation/mitigation phase of defendant's death penalty hearing. Defendant further directs our attention to an instruction that guided the jury's deliberations at the close of the second sentencing phase. The instruction informed the jury that it could consider as an aggravating factor "any other reason supported by the evidence why the defendant should be sentenced to death." The instruction also stated that aggravating factors could include factors not specifically listed elsewhere in the instructions. According to defendant, this instruction permitted the jury to weigh nonstatutory aggravating factors, such as the armed robbery conviction, against any mitigating evidence introduced by defendant. Defendant maintains that the jury's consideration of the armed robbery conviction as an aggravating factor impermissibly "tainted" his death sentence and compels us to vacate the sentence.

Defendant's argument raises two issues for our consideration. Preliminarily, we must decide whether the

State's reference to defendant's armed robbery conviction constituted error. If we find error, we then must decide whether the error necessitates an automatic reversal and remand for resentencing or, alternatively, whether this court may resolve the error and resentence defendant without remanding the matter to the circuit court.

At the time the State's Attorney urged the jury to consider defendant's armed robbery, the armed robbery conviction was a fact. The conviction was also a pertinent event in defendant's criminal history, which the State was permitted to introduce as an aggravating factor and to rebut mitigating factors raised by defendant. 720 ILCS 5/9—1(c)(1) (West 1996).

Upon review, this court finds that at the guilt phase of defendant's trial, an improper instruction formed the basis for defendant's armed robbery conviction. We have held that this instruction was incorrect and, accordingly, reversed the conviction. During the second phase of defendant's sentencing hearing, however, the jury believed it had lawfully found defendant guilty of armed robbery. Moreover, defendant has only one armed robbery conviction in his criminal history, so there can be no dispute as to which conviction was referenced by the State. The fact the jury believed defendant was guilty of armed robbery, when legally in fact he was not, constitutes error.

Having determined that the jury incorrectly considered an armed robbery conviction as an aggravating factor at the second stage of the sentencing process, this court must now decide whether the error demands an automatic remandment for resentencing or whether this court may assume the sentencing responsibilities. Sentencing in state capital-punishment cases implicates at least three constitutional rights of a criminal defendant: the sixth amendment right to a fair trial, the eighth

amendment right to be free of cruel and unusual punishment, and the fourteenth amendment right to due process. *Clemons v. Mississippi*, 494 U.S. 738, 745, 746, 748, 108 L. Ed. 2d 725, 736, 737, 738, 110 S. Ct. 1441, 1446, 1447, 1448 (1990). Neither defendant's sixth amendment right to a jury trial nor his eighth amendment right to avoid cruel and unusual punishment requires this court to remand the proceedings for a new sentencing hearing. The United States Supreme Court has held that decisions concerning punishment do not require a jury's deliberations. *Enmund v. Florida*, 458 U.S. 782, 797, 73 L. Ed. 2d 1140, 1151, 102 S. Ct. 3368, 3376 (1982). In *Spaziano v. Florida*, 468 U.S. 447, 459, 460, 82 L. Ed. 2d 340, 352, 352-53, 104 S. Ct. 3154, 3161, 3162 (1984), the Court stated:

"[D]espite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding—a determination of the appropriate punishment to be imposed on an individual. [Citations.] The Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue."

See also *People v. Mack*, 167 Ill. 2d 525, 534 (1995).

Similarly, neither the United States Supreme Court nor this court interprets the eighth amendment as prescribing sentencing by a jury only. The eighth amendment demands that the "sentencing decision be based on the facts and circumstances of the defendant, his background and his crime." *Clemons*, 494 U.S. at 748, 108 L. Ed. 2d at 738, 110 S. Ct. at 1448. The "twin objectives" of the eighth amendment are " 'measured consistent application [of the death penalty] and fairness to the accused.' " *Clemons*, 494 U.S. at 748, 108 L. Ed. 2d at 738, 110 S. Ct. at 1448, quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110-11, 71 L. Ed. 2d 1, 8, 102 S. Ct. 869, 874 (1982). Nothing inherent in the composition of a jury limits fair, consistent or informed sentencing to a jury. A reviewing court can just as easily master these functions,

and in some instances, enjoys an advantage over juries in its knowledge of sentencing objectives compatible with the Constitution. See *Clemons*, 494 U.S. at 749, 108 L. Ed. 2d at 738, 110 S. Ct. at 1448. Consistent with the eighth amendment, therefore, a reviewing court may engage in a harmless error analysis, and determine whether, beyond a reasonable doubt, the sentencing jury would have reached the same finding regardless of the introduction of the erroneous evidence, argument or instruction. *Clemons*, 494 U.S. at 752-53, 108 L. Ed. 2d at 741, 110 S. Ct. at 1450. A court of review can also "reweigh" aggravating factors against mitigating factors, replicating the deliberation asked of a jury at the sentencing phase. *Clemons*, 494 U.S. at 749, 108 L. Ed. 2d at 738, 110 S. Ct. at 1448.

Parenthetically, when the *Clemons* Court referred to a reviewing court's authority to "reweigh" evidence, the Court ascribed a very specific meaning to "reweigh." *Clemons*, 494 U.S. at 745, 749, 108 L. Ed. 2d at 736, 738, 110 S. Ct. at 1446, 1448. There are two types of state statutory schemes for imposing the death penalty. Under one type of statute, the trier of fact in a capital sentencing proceeding must consider only statutory aggravating factors, introduced at the eligibility phase, during deliberations at the aggravation and mitigation phase. *Williams v. Cain*, 125 F.3d 269, 282-83 (5th Cir. 1997). The jury must balance these factors against mitigation evidence and determine if the established aggravating factors outweigh the mitigating evidence. *Williams*, 125 F.3d at 283. In the lexicon of capital sentencing case law, states that employ this scheme are called "weighing" states. *Williams*, 125 F.3d at 282-83; *Hampton v. Page*, 103 F.3d 1338, 1342 (7th Cir. 1997). The alternative, or "nonweighing," method allows the trier of fact to consider any relevant aggravating factor at the second stage of sentencing, including *but not limited to* the statu-

tory aggravating, or eligibility, factors. *Williams*, 125 F.3d at 283; *Hampton*, 103 F.3d at 1342. Thus, the statutory aggravating factors "play no role in the sentencing process above the role of other evidence." *Williams*, 125 F.3d at 283. Illinois is a nonweighing state. 720 ILCS 5/9—1(c) (West 1996).

We find nothing in the eighth amendment analysis that would prevent a reviewing court in a "nonweighing" state from also assuming the sentencing functions of a jury. The determinative inquiry is whether the reviewing court, in performing the sentencing duties of a jury, actually fulfills those sentencing responsibilities in a meaningful manner. *Clemons*, 494 U.S. at 750-52, 108 L. Ed. 2d at 739-40, 110 S. Ct. at 1449-50. In doing so, the court complies with the eighth amendment requirement that there be an individualized determination of whether defendant should be put to death, based on a consideration of defendant's circumstances and the facts surrounding his crime. *Hampton*, 103 F.3d at 1343.

Protection of a criminal defendant's fourteenth amendment due process right, however, requires a separate analysis. Where a statutory sentencing scheme allows a criminal defendant to designate a jury as his sentencing body, the defendant acquires a liberty interest in having a jury deliberate his fate. *Hicks v. Oklahoma*, 447 U.S. 343, 346, 65 L. Ed. 2d 175, 180, 100 S. Ct. 2227, 2229 (1980); *People v. Ramey*, 151 Ill. 2d 498, 548 (1992). "The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion [citation], and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State." *Hicks*, 447 U.S. at 346, 65 L. Ed. 2d at 180, 100 S. Ct. at 2229. A reviewing court may not usurp the jury's authority without stripping the defendant of his liberty inter-

est. *Hicks*, 447 U.S. at 346, 65 L. Ed. 2d at 180, 100 S. Ct. at 2229.

However, the United States Supreme Court has also ruled that this liberty interest may not be absolute. The scope of a criminal defendant's liberty interest in having a jury decide his fate pursuant to a capital sentencing statute is created by, and therefore is wholly dependent on, the terms of the sentencing statute. *Clemons,* 494 U.S. at 747, 108 L. Ed. 2d at 737, 110 S. Ct. at 1447; *Hicks*, 447 U.S. at 346, 65 L. Ed. 2d at 180, 100 S. Ct. at 2229. If the statute allows a reviewing court to perform the sentencing function, then appellate resentencing would not violate defendant's due process rights. See *Clemons*, 494 U.S. at 747, 108 L. Ed. 2d at 737, 110 S. Ct. at 1447.

In *Clemons,* 494 U.S. 738, 108 L. Ed. 2d 725, 110 S. Ct. 1441, a criminal defendant argued that Mississippi's capital sentencing act vested the defendant with a liberty interest in having a jury decide whether the defendant could be put to death. *Clemons*, 494 U.S. at 747, 108 L. Ed. 2d at 737, 110 S. Ct. at 1447. The State of Mississippi countered that it could perform the jury sentencing functions itself, thereby implying that any liberty interest bestowed on criminal defendants by its state sentencing scheme was not unqualified. *Clemons*, 494 U.S. at 747, 108 L. Ed. 2d at 737, 110 S. Ct. at 1447. The Supreme Court refused to question Mississippi's construction of a Mississippi statute: if a state, in interpreting its own law, determines that its courts could engage in "appellate re-sentencing" without violating a liberty interest held by a defendant, then the United States Supreme Court was bound to yield to the state's construction of state law. *Clemons*, 494 U.S. at 747, 108 L. Ed. 2d at 737, 110 S. Ct. at 1447; see also *Mack*, 167 Ill. 2d at 534 ("We note that this due process right to sentencing by a jury does not necessarily preclude an appellate court

from independently 're-sentencing' the defendant when, due to some error, the jury's sentencing decision cannot stand. Instead, the extent to which a reviewing court may engage in such re-sentencing would appear to depend on State law"). Following *Clemons*, we conclude that if a state sentencing statute permits appellate resentencing, and the appellate panel complies with the sentencing requirements, then defendant's liberty interest will not be imperiled when the reviewing court assumes sentencing responsibilities itself. *Clemons*, 494 U.S. at 746-47, 108 L. Ed. 2d at 736-37, 110 S. Ct. at 1447.

In the instant appeal, we find that the Illinois capital sentencing statute does not permit a court of review to usurp the jury's role as sentencer without damaging defendant's due process rights. *Mack*, 167 Ill. 2d at 534; *People v. Ramey*, 151 Ill. 2d at 550; 720 ILCS 5/9—1(d) (West 1996). The statute plainly states that, if a defendant elects to have a jury perform the sentencing function, the jury and the jury alone will determine defendant's eligibility for death and whether any mitigating factor or factors should preclude capital punishment. 720 ILCS 5/9—1(g) (West 1996). By its terms, the Illinois capital sentencing statute does not permit this court to assume these responsibilities. Defendant has a liberty interest in having a jury "make particular findings relative to sentencing." *Mack*, 167 Ill. 2d at 534.

We note that defendant's fourteenth amendment due process right does not preclude this court from applying a harmless error analysis to the State's erroneous introduction of the armed robbery conviction. The harmless error inquiry does not require this court to perform any of the jury functions described in the capital sentencing statute. Further, most errors of constitutional dimension are subject to a harmless error analysis. Only those constitutional violations that are "structural defects in

the constitution of the trial mechanism," such as total deprivation of the right to trial counsel or absence of an impartial trier of fact, are *per se* error that necessitate remandment for a new proceeding. *Arizona v. Fulminante*, 499 U.S. 279, 309-10, 113 L. Ed. 2d 302, 331, 111 S. Ct. 1246, 1264-65 (1991). Such error undermines the trial's fundamental function of determining the defendant's guilt or innocence. *Fulminante*, 499 U.S. at 308, 310, 113 L. Ed. 2d at 330, 331, 111 S. Ct. at 1264, 1265. If, however, the error is in the nature of a "trial error," *i.e.*, one which "occurred during the presentation of the case to the jury," then the error is subject to harmless error review. *Fulminante*, 499 U.S. at 307-08, 113 L. Ed. 2d at 330, 111 S. Ct. at 1264. Such an error does not taint the fundamental truth-seeking function of the trial, and may be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 308, 113 L. Ed. 2d at 330, 111 S. Ct. at 1264. Error is harmless only if "it is proven beyond a reasonable doubt that the error did not contribute to the defendant's conviction." *People v. Dean*, 175 Ill. 2d 244, 259 (1997).

After careful consideration of the record, we find that the erroneous introduction of defendant's armed robbery conviction to the jury at phase two of his capital sentencing hearing is in the nature of a trial error, so that it is subject to harmless error scrutiny by this court. However, we cannot conclude beyond a reasonable doubt that introduction of defendant's armed robbery conviction as an aggravating factor did not contribute to the jury's verdict.

The same jury that found defendant a candidate for the death penalty had, immediately preceding the sentencing hearing, found defendant guilty of the armed robbery. This was defendant's first and only armed rob-

bery conviction and constituted a crime qualitatively different from the drug possession and burglary charges that dominated his criminal history. Defendant's record included arrests for possession of stolen property in 1985, for possession of cannabis in 1987, for residential burglary and for possession of cocaine and battery in 1990, for burglary in 1992, and for possession of drugs with intent to deliver and obstructing a peace officer in 1994. Additionally, defendant had pleaded guilty to the following crimes: a misdemeanor drug sale in 1984, unlawful use of weapons in 1985, misdemeanor retail theft in 1990, and burglary in 1994. The 1994 guilty plea for burglary arose from a crime that occurred in 1992. For that incident, defendant received a three-year sentence in the Illinois Department of Corrections. According to Detective Robert Brenczewski of the Joliet police department, defendant was on parole from that sentence at the time of the Simenson murder.

Family and expert witnesses testifying at the aggravation/mitigation phase of defendant's sentencing hearing indicated that defendant's personal history, while troubled, was unremarkable for extreme violence. Defendant's elder sister, Brenda Marshall, stated that defendant was the youngest of nine children, raised in a fun, loving home. Defendant's father died when defendant was 11, and when defendant was 9, defendant's elder brother, Ellis, died of a heart attack. Marshall said defendant had been very close to Ellis.

Marshall said defendant's mother made her children attend church, and attempted to impart the value of hard work to her children. Marshall testified that all of her other siblings work hard and work every day.

According to Marshall, defendant had been employed in the 11 years preceding the trial. She stated he worked as a parking lot attendant for four years, but left that job for another, because he wanted to better himself. Mar-

shall testified that defendant had also worked in a warehouse in Romeoville, and for the Sunny Hill Nursing Home, but she did not know what he did there. Defendant had talked to Marshall about wanting to work as a Will County sheriff.

Defendant occasionally lived with Marshall and her husband. Defendant "looked up to" Marshall's husband and helped him remodel Marshall's home.

Marshall has never seen defendant act violently or abuse drugs. She stated that his biggest problem is that he is a "follower." Defendant will do what others want him to do because he does not want to be called a "square."

Concerning defendant's relationship with his girlfriend, Kari, Marshall averred that, initially, their relationship was a good one. She said that defendant's son, Brandon, is a well-mannered child and an "A" student. However, Marshall asserted that defendant and Kari's mother, who resided with Kari, would drink excessively when defendant was at Kari's home, causing problems within the household.

Wade Hill, defendant's brother and 20 years defendant's senior, also testified. Since May 1992, Hill has seen defendant on at least a weekly basis, when defendant was not in jail. Defendant worked with Hill on construction projects, including some roofing projects in 1994. Hill described defendant as a reliable and good worker. In Hill's opinion, defendant has all the skills necessary to hold a job in the construction trade and could have earned a living using those skills.

Although Hill testified that he had never seen defendant abuse any substance other than alcohol, Hill conceded that defendant had a lot of friends who liked to drink. Hill said that defendant would gather with six or seven of these friends in an empty lot and drink beer or whiskey.

Veronica Files is Brenda Marshall's daughter and defendant's niece. She testified that before defendant was "in and out of prison," she would see him regularly, at least once a day. She said that during the time defendant was out of prison, but before September 28, 1994, defendant was working in a factory and seemed happy.

Files maintained that defendant was very close to her two sons and was very generous to her. She described defendant's relationship with his own son as close, and said father and son "interacted" "just about every day." Files believed that defendant's relationship with Kari turned bad only after Kari had a child by someone other than defendant.

Files never saw defendant in a fight, and believed he would avoid one if possible. She portrayed defendant as a follower, not a leader. He could be easily persuaded, depending on the situation.

Michael Gelbort, a clinical psychologist, testified in mitigation. Gelbort examined defendant's police and Department of Corrections records, and conducted numerous tests on defendant individually.

Gelbort found defendant's "full scale IQ" to be 78, which Gelbort described as "upper end of borderline mentally deficient range of functioning." Test results showed defendant to be someone who was well behind his peer group in academic performance and had trouble focusing his attention and concentration. Defendant processes information more slowly than a normal person and has abnormal mental control, meaning a poor ability to focus on a subject. Defendant is also a person that will act on impulses that other persons would inhibit. Persons with defendant's personality profile have difficulty making it through school and difficulty holding a job. Their aspirations exceed what they can achieve, leading to frustration.

Defendant is in contact with reality. Defendant

exhibits no signs of psychosis or schizophrenia. He is neither aberrant nor abnormal, with the exception that he lacks self-confidence and exhibits very low self-esteem.

Defendant tends to be a fairly passive person. While Gelbort admitted the existence of some aggressive behavior in defendant, he did not believe this behavior was significant, since defendant has never caused significant bodily harm to someone else. Defendant is most interested in making himself happy and feeling good. Gelbort described defendant as "more a follower than a leader." He is not skilled at anticipating the consequences of his actions.

Gelbort opined that he would not expect to find in someone with defendant's personality profile a person who would instruct another to shoot a police officer. Gelbort believed that, had there been two Gregory Shaws at the intersection of Theodore and Burry on the night of the murder, the murder would not have occurred. Gelbort interpreted defendant's actions on September 28, 1994, as defendant's attempt to keep Elton Williams away from the police, because "if the two mixed there was going to be a problem."

Nevertheless, Gelbort conceded that defendant's IQ would not prevent defendant from planning an escape route from a robbery, nor would it prevent defendant from including in the plan an intent to "take care of business" in case he was caught.

Gelbort testified that defendant has expressed remorse for the murder of Officer Simenson. Defendant talked about the incident on many occasions, and displayed a heartfelt concern for "the children that will grow up without a father."

Two witnesses, William Beavers and Darryl Butler, testified at the aggravation/mitigation phase of the sentencing proceedings concerning defendant's alleged involvement in the armed robbery. Neither Beavers nor

Butler testified at the liability phase of the trial. Beavers testified that, while incarcerated with defendant at the Will County jail, defendant told Beavers that defendant and Williams committed two armed robberies on the date in question. First, they robbed someone of $13 to buy cannabis, and then decided to rob someone else because they "needed more money." Darryl Butler testified that, on the evening of September 27, he was robbed in a parking lot approximately one mile from William Chaney's home. Butler was stopped by an African-American male who pointed a gun at Butler and demanded money. Butler gave him $13. The person that robbed Butler was not defendant, Butler said. Butler did not see a white car in the vicinity of the robbery. Although these were not the only witnesses to testify at the aggravation/mitigation phase, their testimony focused the jury's attention on the armed robbery that the State argued to the jury.

A review of the trial transcripts reveals that the State used the fact of the armed robbery conviction as more than just an aggravating factor. The State insisted that the conviction undermined defendant's contention that defendant lacked a significant criminal history and that he could yet be a law-abiding citizen.

We note that defendant's guilt for all his convictions—armed robbery, felony murder, knowing and intentional murder—rests entirely on a theory of accountability. William Chaney never saw defendant at the scene of the armed robbery. It is undisputed that Williams, not Shaw, fired the gunshots that killed Officer Simenson. In light of these considerations, we cannot say beyond a reasonable doubt that, even without the aggravating factor of an armed robbery conviction, the jury would have found an absence of mitigating factors to outweigh the aggravating factors favoring imposition of the death penalty.

Defendant urges the court to apply the rationale of

*People v. Adams*, 109 Ill. 2d 102 (1985), in vacating defendant's death sentence. We need not rely on *Adams*, however, since we find that the error alleged by defendant does not withstand harmless error scrutiny.

## PROCEEDINGS ON REMAND

Defendant claims that additional errors occurred during his sentencing hearing. These issues may arise again on remand. Consequently, we address each alleged error *seriatim*.

### A. Whether the Circuit Court Erroneously Admitted Certain Portions of a Victim Impact Statement Into Evidence

Defendant argues next that he suffered irreparable harm from the introduction of a victim impact statement written and read by Susan Simenson, the widow of the victim. Defendant does not object to admission of the entire statement, only selected portions which, according to defendant, improperly characterized the crimes committed by defendant, and included an inappropriate recommendation of the type of sentence defendant should receive.

We disagree. As explained below, Mrs. Simenson's statement complied with constitutional restrictions on the content of victim impact statements. Moreover, choosing as we do to dispose of this issue on its merits, we can forgo two additional questions raised in the parties' briefs, namely, whether defendant waived any objection to Mrs. Simenson's testimony, and whether defense counsel rendered ineffective legal assistance.

The victim of a violent crime, including the spouse of a victim, may address the court regarding the impact which the criminal defendant's conduct has had upon the victim. 725 ILCS 120/3, 6 (West 1996). Admission of victim impact evidence does not violate the eighth amendment to the United States Constitution. *Payne v.*

*Tennessee*, 501 U.S. 808, 827, 115 L. Ed. 2d 720, 736, 111 S. Ct. 2597, 2609 (1991). Victim impact evidence is consistent with our legal tradition of examining the harm caused by a crime in order to determine both the elements of a criminal offense and the appropriate punishment that should follow from that crime. *Payne*, 501 U.S. at 819, 820, 115 L. Ed. 2d at 731, 732, 111 S. Ct. at 2605, 2606. "Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *Payne*, 501 U.S. at 825, 115 L. Ed. 2d at 735, 111 S. Ct. at 2608. Further, allowing a jury to consider such evidence at the sentencing stage merely balances the State's interest in having the jury fully informed of the value of the life lost against the interest of the criminal defendant in having the jury informed of mitigating factors that weigh against execution. *Payne*, 501 U.S. at 822, 825, 115 L. Ed. 2d at 733, 735, 111 S. Ct. at 2607, 2608. "[A] State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Payne*, 501 U.S. at 825, 115 L. Ed. 2d at 735, 111 S. Ct. at 2608.

In the case at bar, we find that the bulk of the statements to which defendant objects describe the impact the murder of Simenson had on his family, and thus fall squarely within the permissible range of victim impact evidence. In relevant part, Mrs. Simenson said:

"Now my husband is only a memory due to the selfish and violent actions of Gregory Shaw and Elton Williams. On that horrifying morning of September 28, 1994, my husband's life was reduced for $200 to piles of reports, court files and bags of evidence.

Because of Gregory Shaw, Stephanie and Brandon have been deprived of their father.

Just recently, I realized consciously, for the first time, that I now fall into that, quote, single parent category that I often thought belonged exclusively to divorced couples, which I consider to be a position of choice. Gregory Shaw and Elton Williams made that choice for me on September 28, 1994, when they decided to murder any person who opened the car trunk. Unfortunately that person was my husband.

My children live in fear that when I leave the house something bad might happen to me. We all have nightmares. Stephanie's had nightmares and worries that these defendants will get out of prison and come and get us.

He was a police officer for about 19 years. He received numerous awards and commendations. Tim was a true professional. Even drug dealers he helped convict came to Tim's wake and funeral out of respect for him. Tim didn't deserve to die.

Just as all police officers do, Tim put his life on the line to protect the good and innocent members of society. He made the ultimate sacrifice.

The impact of our last means of protection being annihilated on our streets is frightening to my family. Please renew our faith in the criminal justice system which will bring a phase of closure to this ongoing nightmare that fills our lives."

We do not read the testimony quoted above as a request that the jury recommend that defendant be sentenced to death. In fact, substantially similar testimony by Mrs. Simenson was examined by this court in *People v. Williams*, 181 Ill. 2d 297 (1998), the direct appeal initiated by defendant's codefendant, Elton Williams. In that case, Williams insisted that, in the passage quoted below, Mrs. Simenson was improperly allowed to urge the jury to find Williams eligible for the death penalty.

" 'My family and I are very confident that all of you will return a quick verdict which will send a message to my children, society, and the law enforcement community that we simply will not tolerate or accept our last means of protection being annihilated on our streets. Renew our

faith in the criminal justice system and bring a phase of closure to this ongoing nightmare that fills our lives.

\* \* \*

It hurts and upsets my family terribly to know I can never talk to Tim again and my children will never see their dad again. Elton Williams' attitude is a slap in the face to not only my family but to those—but to those of police officers as well.' " *Williams*, 181 Ill. 2d at 324.

This court did not construe the impact statement admitted in the *Williams* trial as recommending the death penalty to the jury. The court interpreted Mrs. Simenson's pleas for "closure" and a "quick verdict" as an appeal to bring an uncomfortable chapter in the life of her family to an end. *Williams*, 181 Ill. 2d at 325. Further, Mrs. Simenson did not intend to imply that failure to find Williams death-eligible would demonstrate a lack of support for the law enforcement community. Rather, the court read these remarks as being an expression of concern for the community at large. *Williams*, 181 Ill. 2d at 325.

Likewise, in the instant case, we interpret Mrs. Simenson's statements as a request that the jury deliberate quickly to end a painful ordeal for her family, and not an improper suggestion of a sentence for defendant. Mrs. Simenson's description of her husband as an officer may also fairly be construed as her assessment of the loss to the community as a result of the defendant's acts. In *Payne*, 501 U.S. at 822, 115 L. Ed. 2d at 733, 111 S. Ct. at 2607, the United States Supreme Court included "loss to \*\*\* society which has resulted from the defendant's homicide" as an appropriate counterbalance to evidence adduced by a defendant in mitigation at the sentencing phase.

Similarly, the only instance we find of "characterizations" of the crime by Mrs. Simenson is the phrase "the selfish and violent actions of Gregory Shaw and Elton Williams." To the extent this phrase expresses the Si-

menson family's anger and sense of helplessness at the death of Officer Simenson, the phrase is consistent with the legislative purpose animating the victim impact statement statute. 725 ILCS 120/6 (West 1996). Any extra meaning that could be read into the phrase is, in our opinion, muted by the instruction given by the circuit court to the jurors not to allow sympathy, passion or prejudice to influence their deliberations.

B. Whether the Circuit Court Erroneously Permitted Argument That Reduced the Jury's Responsibility in Recommending the Death Penalty for Defendant

Over defendant's objection, the State made the following rebuttal argument during the aggravation/mitigation phase of defendant's capital punishment hearing:

"Now why are we here? How did we get here? We get here because the system works. Because Tim Simenson, Tom Evanoff and Ralph Smith were good cops and they did their jobs. They are out there on the street. What do Tom and Ralph see? They see their supervisor, their sergeant and their friend, shot in the face in cold blood for no reason, unprovoked, in violation of law, right in front of them, and they are armed with .40 caliber Glock handguns.

*They have the ability at that point—think about it. They can fire two to three shots a second. They could have cut Elton Williams in half and they could have shot Gregory Shaw, too, saying he was going for something. They could have executed them both right on the street. But what did they do?*

*These guys showed restraint beyond all belief. The moment that Elton Williams was down and they were out of harm's way they stopped shooting. In fact, Tom Evanoff even took Elton Williams' word for the fact that—he asked him if he had another gun. His hand was underneath him. And Williams shook his head no and he put his gun away. My God, there could have been another gun.*

*These officers showed a lot of restraint. They don't even know where Shaw is at this point. Certainly they could*

*have easily taken care of business right there on the street, but they didn't.*

\* \* \*

*\*\*\* These officers, acting the way they did, making sure that the system worked, not taking care of business on the street, they let the system do its work, they let the case be charged. They let it be brought to court.*

*They let a jury, you, be selected to hear this evidence, and then objectively look at all the evidence and apply the law to that evidence objectively \*\*\*."* (Emphasis added.)

Defendant argues that the circuit court erred in failing to sustain defendant's objection to the italicized statements. Defendant interprets the State's remarks as an impermissible violation of defendant's eighth amendment right to have the jury bear sole responsibility for its capital sentencing decision. According to defendant, the State told the jury that it should feel no remorse about recommending the death penalty for defendant, because the police could have killed defendant immediately following Simenson's death.

In *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985), the United States Supreme Court reviewed comments made by the State's Attorney in closing argument in a capital punishment hearing. In that case, the defendant asserted that opposing counsel's assurances to the jury that any death sentence they recommended would be subject to automatic appellate review violated defendant's eighth amendment rights. The Supreme Court agreed.

The *Caldwell* Court observed that because of the severity of the death penalty, the eighth amendment subjects any capital sentencing determination to a high degree of scrutiny. Accordingly, many of the safeguards placed on the imposition of capital punishment are born of a concern that "the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion." *Caldwell*, 472 U.S. at 329, 86 L. Ed. 2d at 239, 105 S. Ct. at 2639. Eighth amendment analysis

"take[s] as a given" that capital sentencing bodies "[will] view their task as the serious one of determining whether a specific human being should die at the hands of the State." *Caldwell*, 472 U.S. at 329, 86 L. Ed. 2d at 240, 105 S. Ct. at 2640.

The Supreme Court enumerated several dangers inherent in the suggestion that a jury may shift its sense of responsibility to an appellate court. Bound as it is to a record on appeal, a reviewing court cannot evaluate the intangibles of aggravating and mitigating evidence that only a jury is uniquely situated to decide. *Caldwell*, 472 U.S. at 330, 86 L. Ed. 2d at 240, 105 S. Ct. at 2640. Additionally, if it is led to assume that another court will scrutinize its decision, a jury might fulfill its obligations with less care or ground its decisions on factors unrelated to "legitimate sentencing concerns." See *Caldwell*, 472 U.S. at 331-33, 86 L. Ed. 2d at 240-42, 105 S. Ct. at 2640-42. In light of these dangers, the prosecutor's remarks in *Caldwell* were "fundamentally incompatible with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Caldwell*, 472 U.S. at 340, 86 L. Ed. 2d at 246, 105 S. Ct. at 2645, quoting *Woodson v. North Carolina*, 428 U.S. 280, 305, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (1976).

This court has read *Caldwell* as "stand[ing] for the proposition that the prosecution may not lead a jury to believe that responsibility for a death sentence rests elsewhere, when State law places that responsibility on the jury." *People v. Pasch*, 152 Ill. 2d 133, 205 (1992). Also, as we examine prosecutorial arguments for constitutional violations, we must read the arguments in the context of the entire sentencing proceeding. See *People v. Hudson*, 157 Ill. 2d 401, 461 (1993).

Contrary to defendant's interpretation of the State's rebuttal, the State did not suggest that the jury could

relieve itself of responsibility for defendant's sentence. In fact, we discern quite the opposite message in the passage quoted above. The section opens with a reference to "the system," a theme the State then embellishes by reminding the jury how easily the police at the scene of the crime could have dispensed a "justice" of their own, had they wanted to do so. Instead, it is argued, the police allowed the system to function as intended, saving the determination of whether defendant will live or die for the jury, the body designated by our laws to execute this weighty responsibility.

These remarks are consistent with the State's repeated references, elsewhere in its closing arguments, that the jury would decide whether any mitigating evidence precluded imposition of the death penalty. Too, the jury was reminded of its responsibility in instructions that the circuit court read and tendered to the jury. The jurors' duty was made plain again in the verdict forms they took with them to their deliberations. We have previously found instructions, verdict forms and directions by counsel adequate indicia that the jury was not relieved of its singular responsibility of passing judgment on the defendant. See *Hudson*, 157 Ill. 2d at 462; *Pasch*, 152 Ill. 2d at 206.

C. Whether Defendant's Death Sentence is Excessive and Whether Illinois' Death Penalty is Unconstitutional

In light of our decision to vacate defendant's capital sentence and remand for a new sentencing hearing, we need not address these issues.

CONCLUSION

For the reasons stated, we vacate defendant's convictions for felony murder and armed robbery. Defendant's remaining convictions for first degree murder are affirmed. We also vacate defendant's death sentence and

remand this case for resentencing, pursuant to section 9—1 of the Criminal Code (720 ILCS 5/9—1 (West 1996)).

*Convictions affirmed in part and vacated in part; death sentence vacated; cause remanded.*

JUSTICE HARRISON, concurring in part and dissenting in part:

I agree with the majority that we should vacate defendant's convictions for armed robbery and felony murder. I also agree that we should vacate defendant's death sentence on his convictions for intentional and knowing first degree murder and remand the cause to the circuit court for resentencing. I write separately because my reasoning differs in certain important respects from that of my colleagues.

Contrary to the majority, I believe that the circuit court abused its discretion in excusing Mrs. DePolo from the jury panel. It is true that she answered yes when the circuit court asked her whether her beliefs were such that she would automatically vote against the death penalty if defendant were found guilty. As the majority's discussion shows, however, this was actually the second time the same basic question had been put to her. The first time, the court asked her if her beliefs were such that she would not, under any circumstances, consider signing a verdict directing the court to impose the death penalty. To that question she had a very different answer. She gave an unequivocal "no." She had no such scruples against signing a verdict calling for death.

This initial negative response by Mrs. DePolo was fully consistent with all of her other answers to the court's questions. She stated without hesitation or qualification that she had "no strong feelings by reason of religion, morals or conscience against the infliction of the death penalty," that her feelings about the death penalty

would not "prevent or substantially impair [her] ability to reach a fair and impartial decision as to whether the defendant was guilty," and that her views on the death penalty would not "prevent or substantially impair the performance of [her] duties as a juror in accordance with the Court's instructions as to the law and [her] oath as a juror."

Under these circumstances, I fail to see how Mrs. De-Polo's response to the court's second anti-death-penalty question can reasonably be viewed as anything other than an inadvertent misstatement. The questions were phrased in an awkward and cumbersome way. Even the trial judge was confused when he attempted to paraphrase what her answer meant. He initially characterized what DePolo said as indicating that she would automatically sign a death verdict, then caught himself and described her answer as stating the opposite, namely, that she would "refuse to sign a death penalty verdict," or, more accurately, that "she would automatically vote against the death penalty."

A potential juror's views on the death penalty will warrant removal for cause only if they substantially impair the performance of his or her duties as a juror. *People v. Hope*, 168 Ill. 2d 1, 33 (1995). Mrs. DePolo's *voir dire* answers did not reveal her to be a person for whom that would be the case. To the contrary, taken in context and viewed in their entirety, Mrs. DePolo's responses indicated that her personal views would have no effect on her willingness or ability to honor her responsibilities as a juror. To the extent that one of her answers suggested otherwise, it was incumbent on the circuit court to ask appropriate follow-up questions to clarify her position. This simple, commonsense precaution would not have caused any delay or inconvenience, and would have ensured that the jury selection process was free from taint. The circuit court's unwillingness to query

Mrs. DePolo further was completely unjustified, and its exclusion of her from the jury panel was error. Our court has held:

> "The erroneous exclusion of a prospective juror because of the person's views regarding capital punishment, though it will not vitiate the jury's determination of guilt, will necessitate a new sentencing hearing." *People v. Seuffer*, 144 Ill. 2d 482, 508 (1991).

For this reason, in addition to the reasons given by the majority, defendant's death sentence should be set aside and the cause should be remanded for a new sentencing hearing.

The majority would allow defendant to receive the death sentence following remand. To this extent, I dissent. For the reasons set forth in my dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), this state's present death penalty law does not meet the requirements of the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) or article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). On resentencing, defendant should therefore receive a sentence other than death.

JUSTICE NICKELS, also concurring in part and dissenting in part:

With the exception of the first sentence ("I agree with the majority that we should vacate defendant's convictions for armed robbery and felony murder"), I join the partial concurrence and partial dissent of Justice Harrison. For the reasons set forth in my dissent in *People v. Dennis*, 181 Ill. 2d 87, 110 (1998) (Nickels, J., dissenting), I would affirm defendant's convictions for armed robbery and felony murder. The evidence that defendant assisted Elton Williams in his immediate escape from the armed robbery of William Chaney is sufficient to sustain his convictions for those offenses under the principle of accountability.