THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEMETRIUS JACKSON, Defendant-Appellant.

First District (2nd Division)   No. 1—00—1803

Opinion filed September 24, 2002.

Rita A. Fry, Public Defender, of Chicago (Pamela Pfrang, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAHILL delivered the opinion of the court:

Defendant Demetrius Jackson was found guilty of home invasion, two counts of armed robbery and two counts of first degree murder for the deaths of Troy Davis and Lisa Johnson. Defendant was sentenced to concurrent sentences of natural life for the murder counts and concurrent 30-year prison terms for the armed robbery counts. Defendant argues on appeal that: (1) the evidence was insufficient to prove defendant accountable for first degree murder; (2) the court erred in giving a jury instruction mixing the concepts of accountability and felony murder; (3) the State's inflammatory argument and misstatement of the law prejudiced defendant; (4) the mittimus does not accurately reflect the oral judgments entered by the trial judge; (5) natural life sentences were imposed in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000); and (6) the statute mandating natural life sentences is unconstitutional. We affirm.

Troy Davis and Lisa Johnson were discovered, fatally shot, in their apartment on the morning of August 4, 1997, by Lisa's mother, Ida Johnson, the victims' five-year-old son Jason and a neighbor, Dorian Neil. Troy was facedown on the floor, hands tied behind his back with a telephone cord. He had been shot in the back of his head.

Lisa was in the bedroom on the bed, also shot in the head. The victims' four-month-old son, Troy, Jr., was lying in a pool of blood next to Lisa's body, crying hoarsely. The apartment had been ransacked and several stereo components were missing. Troy's car was also missing, as well as a large amount of cash that Troy planned to give a coworker to pay for repairs to a motorcycle that Troy damaged several days earlier.

About 8 p.m. on August 4, police officers pulled over a car matching the description of Troy's car. They arrested the driver, Tyrone Jones, who carried with him $505 and a small stereo remote control. After speaking with Jones, police searched for defendant and his brother, Omar Jackson. Officers also returned to Troy and Lisa's apartment and recovered a .380-caliber expended shell casing from under the bed.

Martese Wash testified at trial that he spent the evening with Troy on August 3, 1997, from 6:45 p.m. until 11:45 p.m. They drank beer, played cards and listened to the radio in Troy's apartment. Troy showed Martese a large amount of money, which Troy then put into his pocket. At 10 p.m., Lisa Johnson arrived with Troy, Jr., and went into the bedroom. Troy's car was still in the parking lot when Martese left.

When Martese learned that Troy and Lisa had been murdered, he went to the police station and spoke to police. He identified Troy's car and noticed that stereo equipment that had been in Troy's house the night before was now installed in the car. One of Troy's amplifiers was in the trunk. Martese denied that anyone else had been in Troy's apartment while he was there the night before.

On August 5, 1997, police officers obtained a warrant and went to defendant's home, where they arrested him. The officers searched the apartment and discovered a Bryco semiautomatic .380-caliber weapon and a .25-caliber semiautomatic weapon. A firearms examiner was unable to identify or eliminate the Bryco weapon as that used in the murders. The .25-caliber weapon did not fire the bullets recovered at the scene.

Detective Andrew Abbott gave defendant his *Miranda* warnings in the presence of another detective at about 3:30 p.m. at the police station. Abbott spoke with defendant for 15 minutes. At 5 p.m., defendant knocked on the interview room door and told Abbott that he wanted to talk about the investigation. Abbott spoke with defendant for about 45 minutes and then called an assistant State's Attorney.

Assistant State's Attorney Tom O'Malley arrived at the station at 11 p.m. He spoke to defendant about 12:30 a.m. O'Malley advised defendant of his *Miranda* rights and then spoke with defendant.

O'Malley interviewed other witnesses and returned at 3:30 a.m. for another conversation with defendant. Defendant agreed to give a statement. O'Malley wrote down the statement, reviewed it with defendant and made changes at defendant's direction. Defendant, Abbott and O'Malley initialed the changes and signed each page of the statement. O'Malley read the statement back to defendant and had defendant read some of the statement to him.

Defendant told O'Malley that about 11:30 p.m. on August 3, 1997, Tyrone Jones told him he had a "crucial lick," which meant a good robbery. Tyrone had a .380-caliber semiautomatic pistol and defendant had a .25-caliber semiautomatic pistol. They talked about going in and "laying the dude on the floor." On the way to 7423 South Yates Avenue, defendant gave Tyrone a glove and showed him a stocking cap that Tyrone could use. When they arrived at the apartment, Tyrone knocked on the door. A voice asked who it was and Tyrone answered "Ty." As the door opened, Tyrone pushed the door open with his shoulder and drew his gun. Tyrone yelled, "Where's the [expletive deleted] at?" Then he locked the door and had the man who answered the door lie facedown on the floor with his arms spread. Tyrone waved his gun around and said, "Where's the loot or I'm going to kill you." Defendant heard a baby crying in another room. Tyrone went into the other room while defendant stayed with the man on the floor and told him "to be cool." Defendant heard Tyrone yell, "Give me the money." A female voice answered, "Don't kill me, don't kill my baby, take what you want." Tyrone came out of the room and handed defendant several folded bills, saying, "Take this, hold on to this." Defendant then told Tyrone, "Come on, let's go." Defendant left the apartment and went home.

Thirty minutes later Tyrone arrived at defendant's house and began telling defendant's brother, Omar Jackson, about the robbery. Tyrone said he "changed the people over," meaning that he killed the people they had robbed. Tyrone gave the .380-caliber pistol to Omar. Defendant took the money from his pocket and gave some to Tyrone. Defendant kept $800 and put it in his closet. The next day he spent $160 on a pair of Nike shoes as a birthday present for himself. Defendant's statement was published to the jury.

At trial, defendant testified that he turned 18 on August 4, 1997. After he was arrested, Detective Abbott questioned him several times but defendant did not respond. Defendant testified that he never had a conversation with Abbott about the murders, was not given the chance to contact anyone and was not given *Miranda* warnings.

Defendant also testified that he did not understand what the assistant State's Attorney meant when he said he was a prosecutor.

Defendant stated that the assistant State's Attorney wrote out the statement while defendant was talking but he never read the whole statement to defendant. Defendant told the assistant State's Attorney that he went to pick up a package at an apartment at 74th Street and Yates Avenue with Omar and Tyrone and only stayed for a few minutes. He said no one had a gun and he did not know what happened in the apartment after he left. Defendant only signed the statement because the detective told him he could go home if he signed it.

Defendant next testified that on August 3, 1997, he was home with his brother Omar when Tyrone Jones arrived about 10:30 p.m. Tyrone asked Omar to go with him to pick up a package. Omar asked defendant to join them. Defendant stated he did not have a gun and did not see anyone with a gun. They went to an apartment at 74th Street and Yates Avenue. Tyrone knocked on the door and a man named Troy answered the door. Troy and Tyrone talked while Omar and defendant sat on the couch. Defendant then told Omar he was going home and asked Troy to open the door for him. Troy walked him to the outer door. About an hour later, Omar returned home. Defendant testified that Omar did not have a gun or money. Tyrone arrived about an hour later. Defendant did not notice Tyrone with a gun or money.

Defendant denied knowing about the two guns recovered from his apartment. He denied committing a robbery at 7423 South Yates Avenue and denied killing Troy Davis or Lisa Johnson. He testified that he was learning disabled and had a third-grade reading ability. But he demonstrated at trial that he was able to read a representative sample of words and phrases from his written statement.

In rebuttal, Assistant State's Attorney O'Malley testified that he asked defendant general, open-ended questions. O'Malley testified that the written statement accurately reflected defendant's answers.

On appeal, defendant argues that the evidence was insufficient to find him accountable for the murders of Troy Davis and Lisa Johnson. Defendant argues that, because he left the apartment before the victims were shot, he cannot be accountable for the murders. We disagree. Here, although the State proceeded under a theory of accountability at trial, defendant was also charged with felony murder. The jury was instructed on felony murder and the prosecutor argued felony murder as an alternative theory. We find the evidence sufficient under either theory.

■ A person is legally accountable for the conduct of another when, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or com-

mission of the offense." 720 ILCS 5/5—2(c) (West 1998). " '[W]here two or more persons engage in a common criminal design or agreement, any acts in the furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts.' [Citation.]" *People v. Terry*, 99 Ill. 2d 508, 514, 460 N.E.2d 746 (1984). When a defendant's specific intent to aid a crime is proven, he is accountable for any crime that happens as a consequence of the intended crime. *People v. O'Reilly*, 250 Ill. App. 3d 622, 621 N.E.2d 194 (1993).

■ Here, defendant does not dispute that he was guilty of armed robbery and home invasion. But defendant relies on *People v. Dennis*, 181 Ill. 2d 87, 692 N.E.2d 325 (1998), in support of his argument that he cannot be convicted of the murders under an accountability theory because he left the scene before they were committed. The issue in *Dennis* was whether the defendant's participation in an escape was an element of the offense of robbery that could form the basis for accountability-based guilt. *Dennis*, 181 Ill. 2d at 95. Unlike *Dennis*, here defendant was a principal with Tyrone in the commission of an armed robbery. Whether defendant was still at the scene at the time of the murders is irrelevant under either an accountability theory or a felony murder theory. The offense of armed robbery was not complete until the use of force was complete. "When force and taking, the essential elements animating the offense, have ended, so has the crime of armed robbery." *People v. Shaw*, 186 Ill. 2d 301, 321, 713 N.E.2d 1161 (1998), citing *Dennis*, 181 Ill. 2d at 103. "We believe the statute, as it reads, means that where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids; and that the word 'conduct' encompasses any criminal act done in furtherance of the planned and intended act." *People v. Kessler*, 57 Ill. 2d 493, 497, 315 N.E.2d 29 (1974). The *Kessler* court cited *Hamilton v. People*, 113 Ill. 34 (1885), in which three people attempting to steal watermelons were discovered by the owner of the patch. In the scuffle that followed, one of the thieves was shot.

> " 'The fact is undisputed that the three defendants, one of whom was armed with a pistol, invaded the premises of the prosecuting witness with a criminal purpose. The business upon which the parties had deliberately entered was a hazardous one. They had a right to expect that in the event they were detected in stealing the melons, it would result in violence endangering life or limb,—as it actually turned out afterwards. That they were all co-conspirators in a dangerous criminal enterprise, is an undisputed fact. Such being the case, whatever was done by one, in contemplation of law was done by all, and all are therefore equally responsible.' " *Kessler*, 57 Ill. 2d at 497-98, quoting *Hamilton*, 113 Ill. at 37-38.

Under accountability, the common design rule provides that an act by one in furtherance of the crime is the act of all. Here, defendant participated in the crime armed with a gun. As in *Hamilton*, he could expect that someone would be shot. Even if defendant left the apartment with the money before the shootings, Tyrone continued using force, which resulted in the murders of Troy Davis and Lisa Johnson. The armed robbery was not complete until Tyrone's use of force ended. Defendant is accountable for the murders because they occurred during the armed robbery.

Under a felony murder theory, because defendant is legally responsible for the armed robbery, he is also accountable for the murders that accompanied the armed robbery. See *People v. Johnson*, 55 Ill. 2d 62, 302 N.E.2d 20 (1973); *People v. Lowery*, 178 Ill. 2d 462, 687 N.E.2d 973 (1997); *People v. Griffith*, 68 Ill. App. 3d 188, 385 N.E.2d 843 (1979); *People v. Stevens*, 98 Ill. App. 3d 158, 423 N.E.2d 1340 (1981). Accountability for felony murder exists if the defendant may be deemed legally responsible for the felony that accompanies the murder. *People v. Shaw*, 186 Ill. 2d 301, 325, 713 N.E.2d 1161 (1998), citing *People v. Hicks*, 181 Ill. 2d 541, 547, 693 N.E.2d 373 (1998). Felony murder applies here as an alternative theory to accountability because it was charged in the indictment, argued by the State at trial and included in the jury instructions.

■ Defendant next argues that the jury was improperly instructed because the concepts of accountability and felony murder were combined. Defendant has waived this argument on appeal by failing to object to these instructions at the time they were given or in his post-trial motion. *Shaw*, 186 Ill. 2d at 326, citing *People v. Vargas*, 174 Ill. 2d 355, 362, 673 N.E.2d 1037 (1996). We find no plain error here, where the evidence was not closely balanced and there was no substantial risk that defendant was denied a fair trial. *People v. Herrett*, 137 Ill. 2d 195, 209-10, 561 N.E.2d 1 (1990). We also note that the instructions defendant complains of are all pattern jury instructions (Illinois Pattern Jury Instructions, Criminal, Nos. 5.03, 5.03A, 7.02 (4th ed. 2000)) and similar instructions were found proper in *People v. Ramey*, 151 Ill. 2d 498, 536-38, 603 N.E.2d 519 (1992).

■ Defendant argues that the prosecutor made improper comments during closing argument. Defendant complains that the prosecutor made improper remarks about the victims' children, misstated the law of accountability and misstated the evidence.

The prosecutor's comments during closing included:

"The fact that the young child was right next to his mother's body when she was executed meant nothing, nothing.

\* \* \*

Demetrius Jackson may not have left his fingerprints behind or any evidence of his existence in that apartment, but what he and his partner left behind were two orphans and a whole lot of broken hearts.

\* \* \*

The defendant is the reason we are all here today. The defendant is the reason why Jason and Troy Jr. will never celebrate another birthday, a graduation, their first job, any wedding with their parents."

Defendant failed to object to these remarks at trial.

Prosecutors are allowed a great deal of latitude in closing argument so long as it is based on the evidence or a reasonable inference drawn from the evidence. *People v. Cisewski*, 118 Ill. 2d 163, 175-76, 514 N.E.2d 970 (1987). It is error for a prosecutor to refer to a victim's family where it has no bearing on the guilt or innocence of the accused. *People v. Neal*, 111 Ill. 2d 180, 489 N.E.2d 845 (1985). But evidence that a victim had family does not warrant reversal where the victim's children are involved in the facts of the case. *People v. Lee*, 86 Ill. App. 3d 922, 937, 408 N.E.2d 335 (1980). Here, defendant's statement included a reference to a crying baby. The baby was discovered by Ida Johnson next to his mother's body. The victims' five-year-old son was also present when his parents' bodies were discovered. Isolated comments that the victims would miss milestones in their children's lives are not reversible error where they were not a material factor leading to defendant's conviction. See *People v. Terrell*, 185 Ill. 2d 467, 513, 708 N.E.2d 309 (1998).

Defendant also argues that the prosecutor misled the jury about defendant's participation in the murders and misstated the law of accountability during closing argument. We disagree.

The prosecutor argued in closing: "I keep using the word 'they' because you are going to learn that in fact and in law they were working together." He also stated, "They got what they wanted, they took what they wanted, and they left. \*\*\* After they had killed the only two witnesses who could identify them." Defense counsel repeatedly objected to the prosecutor's use of the word "they," stating, "Mr. Demetrius Jackson is not even alleged to have committed the actual act." He also objected to the State's use of a hypothetical illustrating the theory of accountability. The trial court overruled defense counsel's objections. The prosecutor also outlined what the State is required to prove under the jury instructions for murder, home invasion and armed robbery, but defense counsel did not object. "A prosecutor properly may give examples illustrating the application of the law to the facts, and where the prosecutor correctly states the law, there can

be no prejudice to the opposing party." *People v. London*, 256 Ill. App. 3d 661, 665, 628 N.E.2d 621 (1993), citing *People v. Steffens*, 131 Ill. App. 3d 141, 151, 475 N.E.2d 606 (1985). Where the jury is accurately instructed on the law and the role of closing arguments, a prosecutor's misstatement of the law is not grounds for reversal.

■ Defendant next argues that the mittimus should be corrected to accurately reflect the trial judge's oral order that defendant was guilty of two counts of murder under counts I and II, two counts of armed robbery under counts XII and XIII, and one count of home invasion under count IX. The State concedes that the mittimus says defendant was convicted of two counts of home invasion, counts IX and XII. The record shows that count XII charges armed robbery. We direct that the mittimus be corrected to reflect convictions on two counts of first degree murder, two counts of armed robbery and one count of home invasion. *People v. Maldonado*, 224 Ill. App. 3d 913, 918, 586 N.E.2d 788 (1992). The statutory citation for count II should also be corrected to read "720 ILCS 5/9—1(a)(1)."

■ Defendant contends that his sentence of natural life imprisonment for first degree murder must be vacated under *Apprendi*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348. *Apprendi* requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to the trier of fact and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 483 n.10, 147 L. Ed. 2d at 474 n.10, 120 S. Ct. at 2359 n.10. Here, defendant was charged with and convicted of the murders of Troy Davis and Lisa Johnson. Under the Unified Code of Corrections (the Code), the trial court is required to impose a sentence of natural life if the death penalty was not imposed where the defendant was found guilty of murdering more than one victim. 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 2000). We agree with the State that, under these circumstances, *Apprendi* was not violated. The jury found defendant guilty of the murder of two victims. In imposing a natural life sentence, the trial judge did not increase the penalty for first degree murder beyond the statutory maximum. *Apprendi* does not apply here.

■ Defendant's final argument is that the statute mandating natural life imprisonment for the murders of more than one victim is unconstitutional. Defendant claims that section 5—8—1(a)(1)(c)(ii) of the Code violates the separation of powers clause of the Illinois Constitution (Ill. Const. 1970, art. II, § 1). Our supreme court rejected a similar challenge in *People v. Taylor*, 102 Ill. 2d 201, 464 N.E.2d 1059 (1984).

"The rehabilitative objective of article I, section 11, should not and

does not prevent the legislature from fixing mandatory minimum penalties where it has been determined that no set of mitigating circumstances could allow a proper penalty of less than natural life for the crimes of two or more murders. It is within the legislative province to define offenses and determine the penalties required to protect the interests of our society. [Citations.] We cannot say that the penalty called for in section 5—8—1(a)(1)(c) violates article I of section 11." *Taylor*, 102 Ill. 2d at 206.

We affirm the judgment of the trial court and direct that the mittimus be corrected as set out in this order.

Affirmed; mittimus corrected.

McBRIDE, P.J., and GORDON, J., concur.