NOTICE

Decision filed 04/14/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 150232-U

NO. 5-15-0232

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Marion County. |
| | ) | |
| v. | ) | No. 14-CF-306 |
| | ) | |
| JOHNNIE K. MACK, | ) | Honorable |
| | ) | Mark W. Stedelin, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Welch and Justice Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: This direct appeal does not present any issue of arguable merit, and therefore appointed appellate counsel is granted leave to withdraw, and the judgment of conviction is affirmed.

¶ 2    The defendant, Johnnie K. Mack, appeals from a judgment of conviction. A Marion County jury found the defendant guilty of first-degree murder. Subsequently, the circuit court of Marion County found that the defendant qualified as a habitual criminal, and the court imposed a mandatory sentence of natural life imprisonment. The defendant's appointed counsel in this appeal, the Office of the State Appellate Defender (OSAD), has concluded that this appeal lacks merit. On that basis, OSAD has filed a motion to withdraw as counsel, along with a brief in support of the motion, all in accordance with *Anders v. California*, 386 U.S. 738 (1967). In its *Anders* brief, OSAD discusses a wide variety of potential issues, from a speedy-trial issue to sentencing

1

issues.  OSAD notified the defendant of its withdrawal motion and mailed him a copy of the motion and brief.  This court granted the defendant ample opportunity to respond to OSAD's motion by filing a *pro se* brief, memorandum, etc., but the defendant has not filed any such document.  This court has examined OSAD's motion and brief, as well as the entire record on appeal, and has concluded that this appeal does indeed lack merit.  Accordingly, OSAD is granted leave to withdraw as counsel, and the judgment of conviction is affirmed.

¶ 3                                          BACKGROUND

¶ 4       On November 10, 2014, the State charged the defendant with two counts of first-degree murder in connection with the shooting death of David Harris earlier that day.  On November 11, 2014, the defendant was arrested on those charges.  On November 12, 2014, the defendant made his first appearance in the case; the circuit court appointed counsel and scheduled a preliminary hearing for December 2, 2014.  The preliminary hearing was held as scheduled.  The circuit court found probable cause, defense counsel requested the earliest available date for jury trial, due to the defendant's being in custody, and the court scheduled a pretrial hearing for December 30, 2014, and a jury trial for January 20, 2015.

¶ 5       On December 30, 2014, the court and the parties discussed ongoing discovery, and scheduled a final pretrial hearing for January 8, 2015.  However, on January 8, 2015, defense counsel moved to continue the jury trial to the February jury-trial setting, and the defendant indicated his understanding that the delay would toll the running of the speedy trial clock.  Without objection by the State, the court vacated the January jury setting and rescheduled the trial for February 17, 2015, with a pretrial hearing on February 3, 2015, and a final pretrial hearing on February 12, 2015.  However, on February 12, 2015, defense counsel moved to continue the trial from February 17, 2015, to March 16, 2015.  It was the last time that the defendant moved to

2

continue the trial, and the defendant never agreed to or acquiesced in a continuance sought by the State.

¶ 6     On May 4, 2015, just prior to the start of *voir dire* in the defendant's trial, the court heard arguments on the defendant's written motion *in limine* asking that the circuit court preclude the State from offering into evidence the recordings of Debra Mack's 9-1-1 calls. Defense counsel explained that his objection to the 9-1-1 calls was that they included two comments made by the 9-1-1 operator and directed to a deputy or emergency-medical personnel. Specifically, defense counsel objected to the 9-1-1 operator's comment that Debra Mack had reported seeing the defendant shoot David Harris, and the operator's comment that Debra Mack was declining to provide important information. According to defense counsel, neither of those two comments was true, *i.e.*, Debra Mack did not say that she had seen the defendant shoot Harris, and Debra Mack did not decline to provide important information. The State argued that the recordings were admissible as excited utterances and did not contain anything unusual or improper. After listening to the 9-1-1 recording, the circuit court denied the defendant's motion *in limine*, explaining that Debra Mack's statements were indeed admissible as excited utterances, and any prejudice from the 9-1-1 operator's commentary was minimal.

¶ 7     Immediately after the court denied the motion *in limine*, the prospective jurors were brought into the courtroom, and the court introduced the court personnel and the lawyers. Then, the court read aloud to the entire venire a brief description of the nature of the case, noting that the defendant was charged with two counts of first-degree murder and further noting that it was alleged that on November 10, 2014, the defendant "shot David Harris in the back." A bit later, the court read aloud to the entire venire a list of the names of potential witnesses. During its questioning of potential jurors, the court invariably asked whether they had heard or read anything about the case,

3

whether anyone close to them had been murdered, and whether there was any reason that they could not be fair and impartial jurors. Several potential jurors indicated that they had heard or read something about the case. The court also asked potential jurors whether they were familiar with the attorneys, the defendant, or any of the potential witnesses. Of all the potential jurors who indicated that they had heard or read something about the case, only one indicated that her familiarity with the case, or with some of the people involved in the case, would affect her ability to decide the case fairly and impartially, and the court excused her for cause.

¶ 8    During the trial's evidentiary phase, the 9-1-1 operator, Centralia Police Department dispatcher Stacey Jolliff, testified that on November 10, 2014, between 2 and 3 a.m., she was on duty when she received a 9-1-1 call from Debra Mack (Debra), who reported a shooting at Debra's residence in Sandoval, Illinois. Jolliff questioned Debra about what was going on. The call ended when the line went dead. However, Debra soon called back. Jolliff identified State's exhibits 1 and 2 as accurate recordings of the two 9-1-1 calls from Debra. The two recordings were published to the jury, and are included in the record on appeal. The first 9-1-1 call lasted approximately 7½ minutes. During that first call, Debra sounded frantic much of the time, but she clearly hesitated to provide information about the specific circumstances of the shooting or the identity of the shooter. However, in response to Jolliff's repeated questions, Debra stated that she "heard" the gunshot, that her husband was the shooter, that her husband's name was "Johnny Mack", that "Dave Harris" was the person who was shot, that her husband shot Harris due to anger, and that her husband, after shooting Harris, left the house and took the gun with him. Approximately six minutes into the first 9-1-1 call, Jolliff told a first responder, whether a sheriff's deputy or an emergency medical technician, that Debra "saw the subject get shot." Approximately seven minutes into the first 9-1-1 call, Jolliff told a first responder, "I'm not getting any information out

4

of the caller here," but then she immediately recapitulated some of the information that Debra had provided, including the shooter's identity. The second 9-1-1 call was much shorter than the first, and did not include any statements the likes of which defense counsel found objectionable in the first call.

¶ 9     Debra Mack testified that during the afternoon of November 9, 2014, the defendant, David Harris, and a third man (whom Debra did not know) were at the Mack residence, a small house at 310 South Main Street in Sandoval. The three men were watching football on television. Debra was married to the defendant, and she was a friend of Harris, who had served as the defendant's best man at his and Debra's wedding. At some point during that afternoon, Debra left the house in order to run errands. She returned home at approximately 5 p.m. Approximately 30 minutes afterward, the defendant, Harris, and the third man left the house in Harris's vehicle. Debra remained at home that night, and the men remained away.

¶ 10    Debra received a telephone call from Harris at approximately 1 o'clock in the morning, November 10. Harris sounded drunk, and he suggested to Debra that he stop by her house for sex. (Debra's testimony gave the impression that Harris commonly spoke lasciviously when intoxicated.) Debra rebuffed Harris, telling him that the two of them were "just friends." When her telephone conversation with Harris ended, Debra telephoned her husband, the defendant, and informed him about the conversation. While Debra spoke with the defendant, Harris phoned her again. Debra told the defendant that she would answer Harris's call in a manner that would allow the defendant to overhear the conversation between her and Harris. When Debra answered Harris's call, Harris again suggested that he and Debra have sex. Debra wanted the defendant to hear that conversation in order to "prove" to the defendant that there was no truth to the rumors that she and Harris were "messing around." At some point, the defendant hung up his phone, and

5

the conversation between Debra and Harris ended. A bit later, Harris was at Debra's house, knocking on Debra's bedroom window. By phone, Debra informed the defendant that Harris was outside the house. When Harris knocked on the front door, Debra let him in.

¶ 11    According to Debra, Harris said that he was hungry. Debra went to the kitchen to cook him an omelet. At that time, the defendant phoned Debra and asked her whether "that nigger" was still at the house, and she answered that he was. The defendant said that he would be home in a few minutes. Approximately 20 minutes later, the defendant returned home. Debra and Harris were in the kitchen, preparing omelets. The defendant and Harris spoke to one another calmly, though Debra, at trial, could not recall the subject of their conversation. The defendant walked to their backyard shed. Five minutes later, Debra was in her bedroom when she heard the back screen door open, suggesting to her that the defendant was back inside the house. Debra walked to the doorway of her bedroom, and from there she glimpsed the defendant as he walked into the kitchen. Shortly thereafter, with the defendant out of her sight, she heard two or three gunshots. She was shocked. She saw the defendant walk out of the kitchen and into the living room, and at that point he told her to call 9-1-1. The defendant walked out of the house, as Debra remained standing and shocked. The defendant soon walked back into the house. He told Debra, "I should have shot you too, bitch", and he again walked out of the house. Debra immediately dialed 9-1-1, then she walked into the kitchen, where she saw Harris lying on his back, unconscious but breathing. Debra did not see the defendant again that day.

¶ 12    Two Marion County sheriff's deputies, Corey Parker and Jason Smith, testified that on November 10, 2014, at approximately 2:26 a.m., they were on duty and were dispatched to a residence in Sandoval. Debra Mack was inside the house. A black man, later identified as David Harris, was lying on the floor, unconscious, with half his body in the kitchen and half in the living

6

room.  Parker performed CPR until EMS personnel took over.  Parker also found two spent .40-caliber shell casings in the house; he placed cups over the shell casings, in order to preserve them the detectives.  From Debra, Parker obtained a description of the defendant's clothing.  According to Smith, Debra was in a very excited state during the time they were in the house, and very concerned about Harris, but she was able to answer questions.  A subsequent police search for the defendant was unsuccessful.

¶ 13    Shortly after the police and EMS personnel arrived at the Mack residence, the police sought and obtained a warrant to search the house.  During predawn hours, police found, on the kitchen floor, three spent .40-caliber Hornady shell casings.  Police found a spent projectile, that is, a fired bullet, embedded in a kitchen wall, only two inches above the floor.  A red stain, which appeared to be blood, was on the carpet in the kitchen, near the doorway that led to the living room.  No gun was found inside the Mack residence.  There was no apparent sign of a struggle.  The door to the backyard shed was open, and the light inside the shed was on.  Nothing relating to firearms, *e.g.*, a case or ammunition, was found inside the shed.  Nearby, at 304½ East Texas Street, in an above-ground swimming pool that was overgrown with grass and weeds, police found a Glock pistol and a box of .40-caliber Hornady ammunition.  The pistol's slide was locked back.  The magazine was inside the pistol, empty.  As for the box of ammunition, it contained 15 live rounds; the box could hold 20.

¶ 14    Jordyn Bradley, the 17-year-old daughter of Debra Mack, and hence the stepdaughter of the defendant, testified that during November 2014, she was living with her grandmother, Margaret Fair, in a house at 304½ East Texas Street in Sandoval.  The house was only "two to three blocks" from the Mack residence, where Jordyn's mother and younger brother lived with the defendant.  On November 10, 2014, at approximately 2:50 a.m., Jordyn was at her grandmother's house when

she received a telephone call from an aunt, who asked Jordyn to see what was happening at her mother Debra's house. Without waking her grandmother, Jordyn left the house and went to Debra's house. There, police officers told Jordyn that a murder had been committed, and Debra told her that David Harris had been shot. Jordyn remained at Debra's house for a short while, then returned home to her grandmother's house on East Texas Street. In the kitchen of her grandmother's house, Jordyn encountered the defendant, who told Jordyn, "he disrespected me, my wife in my house." Jordyn left the kitchen in order to wake her grandmother. When Jordyn returned to the kitchen, the defendant was gone. Jordyn looked for the defendant outside but did not see him. The aunt who had phoned Jordyn arrived at the grandmother's house, and the aunt, Jordyn, and Jordyn's grandmother together went to Debra's house. There, Jordyn informed police of her encounter with the defendant.

¶ 15    Dr. Raj Nanduri, a forensic pathologist, testified that she performed an autopsy on David Harris. Nanduri found that Harris had been shot "in the lower back" on the right side, "next to the spinal vertebral column." The bullet pierced both of the major blood vessels in the body, then lodged in the lower left quadrant of the abdominal wall, where Nanduri found and collected it. Nanduri opined that this gunshot wound caused Harris's death, which Nanduri classified as a homicide.

¶ 16    Forensic testing revealed that each of the three shells that police found on the floor of the Mack kitchen, the spent projectile that police found in a wall of the Mack kitchen, and the spent projectile that Dr. Nanduri recovered from David Harris's abdominal wall all had been fired from the Glock pistol that police found in the above-ground pool on East Texas Street.

¶ 17    After the State rested, the defendant, who was 50 years old at the time, elected to testify in his defense. According to the defendant, he and David Harris had been close friends for many

8

years. On November 9, 2014, Harris and Harris's cousin arrived at the defendant's residence. They watched football on television and drank beer. At some point, the defendant's wife, Debra, returned home from a shopping trip. Approximately 90 minutes later, the defendant, Harris, and Harris's cousin departed from the defendant's house, in Harris's truck. Harris and the defendant dropped off Harris's cousin, then headed to the Centralia home of Tiffany Watson. Watson and the defendant were friends. Harris and the defendant remained at Watson's house for 60 to 90 minutes. Then, Harris and the defendant went to the defendant's nephew's house, where they remained for one to two hours, talking and drinking beer. Then, Harris and the defendant "drove around for a while" before heading back to Tiffany Watson's house. A party was in progress. After two or three hours, Harris left Watson's house in order to give two guests a ride home. The defendant remained at Watson's house, expecting that Harris would return and give him a ride home to Sandoval, but Harris did not return to Watson's house.

¶ 18     At approximately 1 a.m., November 10, the defendant, still at Watson's house, received a telephone call from his wife, Debra Mack. Debra asked the defendant where he was and why David Harris was at the Mack residence and knocking on the door, and the defendant replied that he did not know why Harris was there. Sometime later, Debra again phoned the defendant and instructed him to listen in on a conversation between her and Harris. The defendant listened as Harris crudely suggested to Debra that he and she have sex. After the conversation between Debra and Harris ended, the defendant told Debra not to allow Harris into the house and that he would be heading home.

¶ 19     The defendant walked part of the way from Centralia to Sandoval, and the defendant's nephew drove him part of the way. When the defendant arrived home, he found that the door was locked. When Debra "finally" opened the door, the defendant stepped into the house and walked

9

directly to the kitchen, where he saw Harris. The defendant indignantly and profanely asked Harris why he was in the defendant's house and why he had talked to his wife "like that." Harris declined to leave, and the defendant walked out of the kitchen, out of the house, and to the backyard shed, where he had stored Harris's firearm at Harris's request. The defendant summoned Debra for assistance in unlocking the shed. Inside the shed, the defendant found a gun belonging to Harris and the bullets that went with it. The defendant put two or three of those bullets in the gun. Then, he walked out of the shed and saw Harris standing on the back porch. The defendant angrily told Harris to leave his house, and he shot one round into the air. Harris went back inside the defendant's house, and the defendant did likewise.

¶ 20    Inside the house, in the kitchen, the defendant walked up to Harris and told him to take the gun and bullets and to leave immediately. Harris merely smirked. The defendant "put the gun up to him" and shot into the kitchen floor, in order to "scare" Harris. Again the defendant ordered Harris to leave. Then, the defendant testified, "[Harris] flinched and I jumped and the gun went off." Harris "stood straight up and was like, okay, you got me", and he fell to the floor. Only at that point did the defendant realize that he had shot Harris. The defendant unequivocally denied any desire or intent to shoot Harris; he even denied intending to pull the trigger for what proved to be the fatal shot. The defendant's wife, Debra, walked into the kitchen, screaming. The defendant told Debra to call 9-1-1. He did not make, or did not recall making, any other comment to her. Panicked, the defendant took the gun and the bullets, walked out of the kitchen, departed the house through the front door, and descended the steps.

¶ 21    The defendant proceeded to walk the two blocks to his mother-in-law's house, while "trying to figure out" what he had just done. No lights were on at his mother-in-law's house. After "pacing" outside for a while, he entered. In his mother-in-law's kitchen, he drank a glass of water

10

and "[tried] to figure out what was going on." His stepdaughter walked into the kitchen, saw him, and started screaming that he had shot Harris and that Harris was dead. The defendant walked out of his mother-in-law's house, paced along one side of the house, and "just threw the gun and bullets in the pool." Then, he ran across the street and telephoned his nephew for a ride. The nephew's wife picked him up and drove him to Centralia, as he requested. In Centralia, the defendant spent the night at an acquaintance's house. The next day, Sunday, the defendant went to the sheriff's office in Salem and turned himself in.

¶ 22    The State, early in its cross-examination, asked the defendant whether he and Tiffany Watson had had sex, and the defendant answered that they had not. The State asked whether he and Watson had had telephone conversations about sex and whether he, during those conversations, had expressed a desire to have sex with her. Defense counsel objected to this line of questioning, on the ground that the State was attempting to impeach the defendant on a collateral matter. In a sidebar, the State said that the defendant's infidelity toward his wife was relevant to the question of whether the defendant was truly upset about Harris's behavior toward the defendant's wife, as he had testified. The court sustained the defendant's objection to the State's line of questioning. At the end of the sidebar, the court informed the jury that it had sustained defense counsel's objection, and it instructed the jury "to disregard the questions regarding Tiffany Watson."

¶ 23    At the start of its closing argument to the jury, the State thanked the jury "on behalf of the citizens of Marion County" and "on behalf of David Harris's mother, sister and son who have been here throughout the trial." Defense counsel objected, arguing that the State's remark was "an attempt to invoke sympathy," and that a verdict "is to be based on facts, not sympathy." The State immediately stated that it was "about to get to" the facts, and the court said, "Then get to it, please."

11

¶ 24    The State reviewed the evidence and argued that it showed that the defendant was guilty of first-degree murder. Then, the State discussed the anticipated instructions on second-degee murder and the mitigating element of a sudden and intense passion resulting from serious provocation by the decedent. As part of that discussion, the State briefly described a "classic example" of second-degree murder, in which "you walk in, come home from work, find your spouse, significant other actively engaged in sex in your bed with somebody else. You grab a lamp, bash him in the head and kill him. That's second[-]degree murder." The State's discussion of second-degree murder did not draw an objection from the defendant.

¶ 25    Defense counsel, during his own closing argument to the jury, argued that the evidence showed that the shooting was accidental, not intentional. One portion of defense counsel's argument was as follows: "The location in the path of the wound is also physical evidence that supports the finding that this was an accident. The shot is on the back toward the right side going toward the left and down. If you were that close to someone and you wanted to kill them, the head, chest, shoot them in the back, it's going to be in the upper part of the back where you expect to hit a vital organ."

¶ 26    Responding to defense counsel's argument about the location of the gunshot wound, the State argued in rebuttal as follows:

"[State]: *** The fact that he was shot in the back proves he didn't mean to kill him. Really? He gets shot right here. I'm not a doctor, but what's right here? I don't know, your liver, your kidneys, your stomach.

[Defense Counsel]: Objection, he's right, he's not a doctor, the liver is not there.

[State]: This area of the body? Sure.

THE COURT: I'll sustain the objection. Proceed.

12

[State]: How many vital organs do you have between your waist and your rib cage? Virtually all of them.

[Defense Counsel]: Again, Your Honor, I'm going to object. There's no testimony this bullet went anywhere near the rib cage.

[State]: Didn't say it hit the rib cage.

[Defense Counsel]: He just did.

[State]: No, I did not. I said what vital organs are between your rib cage and your waist.

THE COURT: I'll overrule that objection.

[State]: If you are wanting to do someone some pretty darn harm, not a bad place to shoot. Your heart is protected by your rib cage. And, remember, I don't have to prove– you don't have to find he intended to kill him. If you find he intended to hurt him pretty darn bad, cause him great bodily harm, that's enough. Shooting someone in the back definitely going to accomplish that. ***"

¶ 27    On May 6, 2015, the jury returned a general verdict of guilty of first-degree murder.

¶ 28    Subsequent to the verdict, the State filed a written statement concerning the defendant's prior Class X felony convictions and seeking to have the defendant adjudged a habitual criminal and sentenced to a term of natural life imprisonment, pursuant to section 5-4.5-95(a) of the Unified Code of Corrections (730 ILCS 5/5-4.5-95(a) (West 2014)). In that written statement, the State noted that on September 22, 1986, the defendant was convicted of armed robbery, a Class X felony, and that he was subsequently convicted of aggravated battery with a firearm, a Class X felony. The State further noted that the instant first-degree murder was committed within 20 years after the judgment of conviction in the first case, after excluding the 14 years that the defendant had

13

spent in custody since the entry of that first judgment. The State attached to its written statement certified copies of the two Class X convictions. The defendant filed through counsel a written response to the State's statement. He acknowledged that he apparently met the definition of a habitual criminal under section 5-4.5-95(a) of the Unified Code of Corrections, but he claimed that the statute ran afoul of various specified provisions of the Illinois and United States Constitutions, while also noting that Illinois courts of review already had rejected those constitutional objections. The State filed a written reply to the defendant's written response, wherein the State cited various Illinois decisions rejecting the various constitutional challenges to section 5-4.5-95(a) that the defendant had presented in his response.

¶ 29    The defendant also filed a motion for judgment notwithstanding the verdict or for a new trial. Therein the defendant claimed that (1) his statutory and constitutional rights to a speedy trial had been violated, (2) the court erred in denying his motion *in limine* to preclude introduction of the 9-1-1 recordings, (3) the court erred in denying the defendant's motion for a directed verdict at the close of the State's case, and (4) the court erred in overruling the defendant's objections to two particular portions of the State's closing argument to the jury, specifically, those portions in which the State discussed a hypothetical second-degree murder scenario and mentioned certain internal organs that were endangered by the gunshot wound sustained by David Harris.

¶ 30    On June 2, 2015, the court held a hearing on the defendant's posttrial motion, and denied the motion. Proceeding to a sentencing hearing, the court found that the defendant was a habitual criminal, as defined in section 5-4.5-95 of the Unified Code of Corrections, and rejected the defendant's arguments that the statute was unconstitutional. Pursuant to that statute, the court sentenced the defendant to imprisonment for a mandatory term of natural life. On behalf of the

14

defendant, the circuit clerk prepared and filed a notice of appeal from the judgment of conviction. The circuit court appointed OSAD as the defendant's appellate counsel.

¶ 31                                    ANALYSIS

¶ 32     As previously noted, OSAD has concluded that this appeal lacks merit, and accordingly it has filed with this court an *Anders* motion to withdraw as the defendant's counsel, along with a supporting brief.  In its brief, OSAD raises several disparate potential issues—all of the issues raised in the defendant's posttrial motion plus a few more.  This court has considered those potential issues and shares OSAD's view that none of them has any merit whatsoever.

¶ 33     OSAD's first potential issue in this appeal is whether the defendant was deprived of his statutory and constitutional rights to a speedy trial.  Where the relevant facts are undisputed, the ultimate question of whether a defendant's statutory right to a speedy trial has been violated is a question of law subject to *de novo* appellate review.  *People v. McGee*, 2015 IL App (1st) 130367, ¶ 25.  The same standard of review applies to the unltimate question of whether the constitutional speedy-trial right has been violated.  *People v. Crane*, 195 Ill. 2d 42, 52 (2001).  (In its *Anders* brief, OSAD neglected to mention the standard of review for these issues.)  A criminal defendant who is in custody must be tried within 120 days after being taken into custody, unless delay is occasioned by the defendant or by certain specified circumstances not present in this case.  See 725 ILCS 5/103-5(a) (West 2014).  The defendant herein was taken into custody on November 11, 2014, and he remained in custody continuously until the start of his trial on May 4, 2015.  So, the defendant's trial started 174 calendar days after he was taken into custody.  However, as described *supra*, the defendant requested and was granted two continuances—one on January 8, 2015, and another on February 12, 2015.  The delay occasioned by those two continuances—a 67-day delay from January 8, 2015, to March 16, 2015—was attributable to the defendant, and it brought the

15

start of the trial within the 120-day statutory period. Given that the defendant was brought to trial within the statutory speedy-trial period, and within six months of the crime, the defendant could not make a meritorious argument that he was deprived of his constitutional speedy-trial right. See *Crane*, 195 Ill. 2d at 48.

¶ 34     OSAD's second potential issue in this appeal is whether reversible error occurred where the potential jurors, during *voir dire*, were not asked whether they knew or were familiar with the decedent, David Harris. The manner and scope of *voir dire* examination falls within the sound discretion of the trial court, and an appellate court will not disturb a trial court's decision regarding *voir dire* unless the decision represents an abuse of discretion. *People v. Rinehart*, 2012 IL 111719, ¶ 16. This court notes that defense counsel did not ask the trial court to ask prospective jurors whether they knew or were familiar with David Harris. Furthermore, defense counsel, despite actively participating in the *voir dire* questioning, never directed that question to any potential juror. Meanwhile, the trial court effectively, though not explicitly, asked the question. The court began *voir dire* by reading a brief but satisfactory description of the nature of the case, a description that included the name of David Harris as the individual who was shot and killed. Then, during its questioning of the potential jurors, the court asked whether they had heard or read anything about the case, whether anyone close to them had been murdered, and whether there was any reason that they could not be fair and impartial jurors. No prospective juror mentioned David Harris during the course of the ensuing colloquies. Given the record of this case, the defendant could not possibly establish that the trial court mishandled the *voir dire* examination or that he was somehow prejudiced by the court's handling of *voir dire*.

¶ 35     OSAD's third potential issue is whether the circuit court abused its discretion in admitting the recordings of Debra Mack's 9-1-1 calls. The admission of evidence falls within the sound

16

discretion of the trial court, and an appellate court will not reverse "absent a clear abuse of discretion resulting in manifest prejudice to the defendant." *People v. Lucas*, 151 Ill. 2d 461, 489 (1992). During a pretrial hearing on the defendant's motion *in limine* concerning those calls, defense counsel explained that he was troubled by two specific portions of Debra Mack's first call to 9-1-1, *viz.*: the 9-1-1 operator's statement to an unnamed first responder that Debra "saw the subject get shot", and the operator's comment to an unnamed first responder that she was "not getting any information out of [Debra]." The jury heard the entire 9-1-1 call. Therefore, the jury heard Debra tell the 9-1-1 operator that she "heard" the shot, and the jury knew that Debra, in fact, did not tell the operator that she "saw" any part of the actual shooting. The jury also heard Debra's hesitancy to divulge some key pieces of information, and it therefore could understand that the operator had some basis for commenting that she was not getting information from Debra. However, the jury also heard Debra eventually provide the operator with a substantial amount of valuable information, and the jury heard the 9-1-1 operator relay some of that information when speaking with first responders. In light of the totality of the 9-1-1 recordings, it is impossible to imagine how the admission of the 9-1-1 recordings could have been erroneous or how the defendant could have been unfairly prejudiced by their admission.

¶ 36    OSAD's fourth potential issue is whether the State's improper cross-examination of the defendant regarding the nature of his relationship with Tiffany Watson resulted in prejudice to the defendant. The State's improper cross-examination on that particular collateral matter clearly did not prejudice the defendant. The trial court sustained defense counsel's objection to that line of questioning, and it promptly admonished the jury to "disregard the questions regarding Tiffany Watson." Through its deft handling of the matter, the court corrected the error and cured any possible prejudice to the defendant. See, *e.g.*, *People v. Hall*, 194 Ill. 2d 305, 342 (2000) (trial

17

court, by sustaining defendant's objection to State's improper question and by admonishing jury to disregard the question and answer, corrected the error and cured any prejudice).

¶ 37    OSAD's fifth potential issue is whether the State's closing argument to the jury included improper material that should entitle the defendant to a new trial. OSAD discusses three particular portions of the State's argument, *viz.*: (1) the State's mention of "vital organs" located between the waist and the rib cage, (2) the State's description of a hypothetical example of second-degree murder, and (3) the State's reference to David Harris's family members. The State has wide latitude during closing arguments, provided that its arguments are based on the evidence presented or on reasonable inferences drawn from that evidence. *People v. Williams*, 192 Ill. 2d 548, 573 (2000). Improper remarks during closing argument are reversible error only when they cause substantial prejudice to the defendant. *Id.* (In its *Anders* brief, OSAD neglected to mention the standard of review for this issue.)

¶ 38    The State's mention of "vital organs" occurred during its rebuttal argument. Defense counsel had argued that the location of the entry wound on David Harris's body—*i.e.*, in the lower back—was evidence that the defendant shot Harris accidentally, and not with an intent to kill him. If someone wanted to kill another person, defense counsel had stated, he would shoot that person "in the upper part of the back where you expect to hit a vital organ." In rebuttal, the State said that "virtually all" of a person's vital organs are "between" the waist and the rib cage, and that if someone wanted to kill or serverely injure another person, this region of the body would be a fine region to shoot. Considered in the context of the entire closing arguments of the parties, this rebuttal argument by the State was a reasonable and proper response to defense counsel's argument. See, *e.g.*, *People v. Johnson*, 208 Ill. 2d 53, 113 (2003) (prosecutor may respond to defense counsel's comments that clearly invite or provoke a response).

18

¶ 39    In its initial argument to the jury, the State described a scenario that it characterized as a "classic example" of second-degree murder—a husband returns home, finds his wife engaged in sexual relations with another man, and, acting under a sudden and intense passion, immediately kills the other man.  The State then contrasted that "classis example" with the situation in the instant case, wherein a considerable amount of time elapsed between the defendant's overhearing the telephone conversation between Debra Mack and David Harris and the defendant's shooting David Harris.  The defendant did not object to the State's discussion of second-degree murder. There is nothing improper about a prosecutor's giving examples, or stating hypotheticals, to illustrate the application of the law to the facts, so long as the prosecutor correctly states the law. See, *e.g.*, *People v. Jackson*, 333 Ill. App. 3d 962, 969 (2002).  In the instant case, the State's hypothetical accurately illustrated the law of second-degree murder and provided a fair and reasonable contrast to the situation involving the defendant and David Harris.

¶ 40    As for the State's reference, at the start of its closing argument, to the defendant's mother, sister, and son, the reference was clearly unrelated to the issue of guilt or innocence and clearly improper.  See, *e.g.*, *People v. Bernette*, 30 Ill. 2d 359, 371 (1964).  However, the reference was quick and was not repeated, and it could not possibly amount to reversible error.  See, *e.g.*, *People v. Oliver*, 306 Ill. App. 3d 59, 73 (1999) ("brief and isolated comments often will not amount to reversible error").

¶ 41    OSAD's sixth potential issue is whether the trial evidence was sufficient to prove the defendant guilty of first-degree murder beyond a reasonable doubt.  When reviewing the sufficiency of the evidence in a criminal case, a reviewing court views the evidence in the light most favorable to the State and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *People v. Collins*, 106 Ill. 2d 237, 261

19

(1985). The defendant testified that he shot David Harris accidentally, or, as he phrased it, "[Harris] flinched and I jumped and the gun went off." However, the defendant was clearly very angry at Harris due to the salacious remarks that Harris had directed toward the defendant's wife, Debra Mack, and the defendant's statements to Debra and to Jordyn Bradley in the moments or minutes after the shooting, as related by those two witnesses during their trial testimonies, evidence an intentional shooting motivated by that anger. The defendant either denied making those statements or said that he did not recall making them. However, credibility determinations are within the exclusive province of the jury. See, *e.g.*, *Collins*, 106 Ill. 2d at 261-62. The jury at the defendant's trial was free to believe Debra Mack and Jordyn Bradley. Likewise, it was free to disbelieve the defendant's testimony that the gun simply "went off."

¶ 42    OSAD's seventh potential issue is whether the defendant was subject to sentencing as a habitual criminal and whether mandatory natural life sentencing for habitual criminals violates one or another constitutional principle. At sentencing, there was no suggestion that the defendant did not meet the statutory definition of a habitual criminal, and the record makes clear that the defendant, due to his two prior Class X convictions and his history of imprisonment, qualifies as a habitual criminal, mandating a sentence of natural life imprisonment for the instant offense. See 730 ILCS 5/5-4.5-95(a) (West 2014). Furthermore, as OSAD acknowledges in its *Anders* brief, the Illinois courts of review already have rejected the various constitutional challenges to the habitual-criminal statute, challenges mentioned in the *Anders* brief and in the defendant's posttrial motion. See, *e.g.*, *People v. Dunigan*, 165 Ill. 2d 235, 244-48 (1995), wherein our Illinois Supreme Court rejected the argument that the habitual-criminal statute violates article I, section 11 of the Illinois Constitution, a provision that requires that all penalties be determined with the objective

20

of restoring the offender to useful citizenship, and rejected the argument that the statute violates the eighth amendment prohibition against cruel and unusual punishment.

¶ 43                                    CONCLUSION

¶ 44    The record on appeal makes clear that none of the potential issues discussed in OSAD's *Anders* brief has any merit whatsoever. This court has not discovered any meritorious issue. Accordingly, OSAD is granted leave to withdraw as counsel on appeal, and the judgment of conviction is affirmed.

¶ 45    Motion granted; judgment affirmed.